[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 688 
The plaintiff, Dorothy Shepherd, appeals from a summary judgment entered in favor of the defendant, Summit Management Company, Inc.
A summary judgment is properly entered if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56 (c)(3), Ala. R. Civ. P. When the moving party has made a prima facie showing that no genuine issue of material fact exists, then the burden shifts to the nonmoving party to produce substantial evidence creating such an issue.Gray v. Liberty Nat'l Life Ins. Co., 623 So.2d 1156 (Ala. 1993);see § 12- 21-12, Ala. Code 1975. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). In reviewing a summary judgment, we must view the evidence in the light most favorable to the nonmovant. Turner v. Systems Fuel,Inc., 475 So.2d 539 (Ala. 1985).
Viewed in the light most favorable to Shepherd, the evidence in the record suggests the following. Shepherd, a black female, began working for Summit Management Company, Inc., ("Summit"), on June 27, 1995, as a housekeeper at Wood Springs, one of the apartment complexes managed by Summit. Shepherd found out about the housekeeping position by telephoning Wood Springs and speaking with Lisa Springer, the assistant manager, who informed Shepherd of the opening. Shepherd went to Wood Springs, completed an application, and was interviewed by Springer. A couple of days later, Shepherd was interviewed by Sara Fredericks, property manager of Wood Gardens, *Page 689 
another apartment complex managed by Summit. The next day Shepherd returned to Wood Springs and Springer offered her the housekeeping position. Her starting pay rate was $6.25 an hour plus a $150 monthly bonus. On December 2, 1994, her pay rate was increased to $6.56 an hour.
Shepherd's duties as a housekeeper included cleaning the leasing office before 9:00 a.m.; cleaning the laundry room, fitness center, bathrooms, and model apartment; checking the guest apartment to see if it needed cleaning; and preparing vacant apartments for new tenants. When Shepherd started working at Wood Springs, her immediate supervisor was Jody Phillips, the maintenance supervisor. In approximately May 1995, Wood Gardens and Wood Springs swapped maintenance supervisors, so that Jody Phillips was replaced as maintenance supervisor by the Wood Gardens maintenance supervisor, Charles English.
Assuming that Shepherd's allegations are true, in approximately May 1995, Springer radioed Shepherd and asked her to report to the office. When Shepherd arrived at the office, Springer informed her that she needed to clean a guest apartment for a resident. Shepherd radioed English from the office to tell him she needed to clean the guest apartment before she could finish cleaning a vacant apartment. English came to the office and, according to Shepherd, he yelled at her and they eventually had a discussion.
About two weeks after this incident, Shepherd received a "personal improvement plan" ("PIP"), which apparently is Summit's terminology for a written warning. The PIP, dated June 8, 1995, states:
 "1. Desired areas of improvement or shortcomings in job performance are identified below:
 "(1) Attitude — not talking to [English] (ignoring him)
 "(2) Job performance — speed at which units are completed
 "2. In order to correct these deficiencies, the attached Action Plan must be completed.
 The following items should be included in your Action Plan:
 "Attitude, have a business relationship with [English] — teamwork.
 "Job performance — work with [English] on completing units at a more effective speed.
"3. Associate's Comments:
 "I feel [English] has a very bad attitude himself, as he says he's the MFIC (if you know what that means). I don't like being rushed to do my job if I'm going to do it well. I'm sorry if I take my time doing so, but that's the way I work. It's not the quantity, it's the quality."
The PIP was signed by Shepherd, English, and Clements. An action plan dated June 9, 1995, and signed by Shepherd, English, and Clements was attached to the PIP. It provided that Shepherd was to meet with English every morning and afternoon, and it instructed her to complete units at "a pace that is expected."
English admitted referring to himself as "the MFIC," but claimed that he did so only once in a joking manner. He was never disciplined for making this remark.
Shepherd testified that, after receiving the PIP on June 8, she reported to English each morning. However, she received another PIP on June 16, 1995. She testified that approximately one week before receiving the second PIP, she and English had another altercation.[1] According to Shepherd, she went to English on a Friday and asked him what work he wanted her to do in a unit that was to be cleaned by a contract cleaner. In response to her question, English said something to the effect that "that's why I don't like niggers." He then got in his car and drove to the office. About an hour later, Clements asked Shepherd to come to the office. In the office, Shepherd received a second PIP, which stated that her attitude had not improved since her June 8 PIP and that she refused to be courteous to her supervisor and to cooperate. It instructed her to improve her attitude and working relationship *Page 690 
by June 30, 1995, or else face possible termination. Shepherd refused to sign the PIP but did write on it that she had discussed the problems with Clements. Shepherd told Clements that English had an attitude problem, that he had made comments to her regarding her race, that she did not want to be treated like a slave, and that English had told her that "sometimes you have to be treated like slaves." She testified that English had made this remark in response to her statement to him that she was not a slave and could not be treated like one.
During this period, Shepherd was seeking to move from her housekeeping position to a leasing position. She testified that when she was hired, Springer and Fredericks had informed her that Summit had a policy of promoting from within the company. Shepherd testified that in June 1995, she discovered that a part-time position was available in leasing at Wood Gardens. She informed Clements that she would like to move into a leasing position, and that Clements told her she would have to complete an "interest analysis," a type of personality/job-placement test required by Summit. Shepherd testified that she completed the analysis and that she was allowed to see only a faxed copy of the results. She testified that Clements did not show her the "hard copy" until after the leasing position had been filled. The record contains a faxed copy of the analysis results, dated August 21, 1995, and with a fax stamp showing the same day. The consulting service that evaluated the analysis recommended Shepherd for a leasing position, finding that she should achieve above-average productivity.
Shepherd testified that Clements told her she would inform Sara Fredericks at Wood Gardens that Shepherd was interested in the part-time position there, but that when Shepherd telephoned Fredericks, Fredericks informed her that Clements had never informed her of Shepherd's interest and that the position had already been filled. On August 3, 1995, Kevin Hodges applied for a leasing position at Wood Springs. This position was created by the resignation of Lisa Spinger, assistant manager of Wood Springs. Hodges was hired and his first day of work was August 29, 1995; the exact date he was hired is not clear from the record. Also in August 1995, Phillips and English swapped positions again, so that Phillips resumed his position as maintenance supervisor at Wood Springs and English went back to Wood Gardens.
On August 31, 1995, Shepherd submitted a resignation letter, which stated:
 "This is to inform you that I am resigning from the position of housekeeper as of today with my last day being Sept. 8th. Reasons being: # 1 I feel that I will never be able to advance with this company due to the fact that 4 positions as leasing has [sic] come and gone and I was never informed that there were any, even though Summit has such a great promotion policy. I have enjoyed working here and has [sic] no animosity towards anyone, even though I feel that management thinks I'm only capable of being a cleaner due to the situations. Being, I've heard through other associates that they were offered positions as soon as they came available and that they never had to ask about them or apply for them and I feel this policy should apply to me also, so I feel kind of discriminated against. And that also applies to the comment that Terry Danner made to me during a conversation from one of his visits (that will always bother me)."
Danner was Summit's regional manager. Shepherd explained that during Tanner's visit in the spring of 1995, she had informed him that she wanted to move into leasing, and he said that he had known of only one housekeeper to become a leasing representative. She had then asked if he was implying she could not do the job, and he stated that that was not his implication. He recommended that she discuss it with Clements and also asked if she had considered moving into a maintenance position.
After Shepherd resigned, but before her last day at work, she asked Clements if she could revoke her resignation. Clements met with Phillips and they decided that they would not allow Shepherd to revoke her resignation. They decided to contract with an independent cleaning service rather than to *Page 691 
rehire Shepherd or hire another housekeeper.
Shepherd filed a complaint with the Equal Employment Opportunity Commission. On January 22, 1996, the EEOC issued Shepherd a right-to-sue letter in which it stated that Shepherd was not qualified for the position she sought, that she did not apply for the position, and that her claims of constructive discharge and retaliation were without merit. The letter also stated that the EEOC did not believe it was likely that any further investigation would result in a finding of a violation.
On April 23, 1996, Shepherd sued Summit in the Jefferson Circuit Court, alleging racial discrimination, retaliation, constructive discharge, and the tort of outrage. On November 20, 1997, Summit moved for a summary judgment. On December 12, 1997, the trial court entered an order stating: "The motion for summary judgment filed 11/20/97 by the Defendant is GRANTED. Costs are taxed to the Plaintiff" A hearing on the motion was apparently held on December 12, 1997; however, the record does not contain a transcript of that hearing. Shepherd appealed to the Alabama Supreme Court, which transferred the case to this court pursuant to § 12-2-7 (6), Ala. Code 1975.
Shepherd argues that the trial court erred in entering the summary judgment on her claim that Summit refused to promote her to a position as leasing representative because of her race. Section 703 (a)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e-2 (a)(1) provides:
 "It shall be an unlawful employment practice for an employer —
 "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."
The plaintiff in a Title VII case has the burden of establishing a prima facie case of racial discrimination.McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802,93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). This can be done by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for and was qualified for the promotion; (3) the plaintiff was denied the promotion; and (4) the individual who received the promotion had lesser or equal qualifications and is not a member of a protected class. Carter v. Three SpringsResidential Treatment, 132 F.3d 635 (Page 11th Cir. 1998). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action. McDonnell Douglas, supra. Once the defendant provides a legitimate reason, the burden then shifts back to the plaintiff to show that the reason articulated by the defendant is a pretext and that the true reason was discrimination. Rollins v. TechSouth, Inc., 833 F.2d 1525 (11th Cir. 1987).
Shepherd, a black female, has satisfied the first element of a prima facie case. She argues that she has also established the second element, that she applied for and was qualified for the position as leasing representative. Summit's job description for leasing representative lists the following prerequisites: "sales experience, preferably in the apartment industry; friendly and [courteous] personality; high school graduate." In addition, one of Summit's written policies states that "[i]t is our policy . . . to promote from within when the associate is the best qualified candidate." As noted previously, Shepherd testified that she was told by Summit employees that Summit had a policy of promoting from within the company.
Before working for Summit, Shepherd had worked as an office aid and as a waitress, had cleaned for a maid service, had worked as a teller at the Birmingham Race Course, and had worked as a tax preparer. She has had no experience in sales, but she contends that her work history includes working in customer service, which she claims qualified her for the position of leasing representative. She bases this claim on Clements's testimony, in which she stated that her own work in customer service had made her qualified for a leasing position. Clements testified that she had worked for two banks in customer service. However, Clements's own situation *Page 692 
is not relevant. Clements had also worked at another apartment complex before being hired by Wood Gardens, where she worked before being transferred to Wood Springs. In addition, when Clements was hired to work as a leasing representative at Wood Gardens, she was not hired by Summit, but by Summit's predecessor, Trammell Crow, another management company.
In its motion for a summary judgment, Summit established a prima facie case showing that Shepherd was not qualified for the position of leasing representative. Shepherd failed to present substantial evidence creating a genuine issue of material fact regarding whether she was qualified for this position. The evidence she submitted on this issue, that being Clements's work history, is not evidence of Summit's hiring policy. The undisputed evidence shows that the job requirements for leasing representative include sales experience and that Shepherd had no experience in sales. Even if she had had experience in customer service, which is arguable, she did not present substantial evidence showing that Summit would accept customer service experience in lieu of sales experience. Because Shepherd did not present substantial evidence to establish a prima facie case on her claim that she was not promoted because of her race, the summary judgment was properly entered in favor of Summit on that claim.
Shepherd also argues that the trial court erred in entering a summary judgment on her claim of retaliation. Section 704 (a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 (a), provides:
 "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . to discriminate against any individual, . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."
To establish a prima facie case of retaliation under Title VII, the plaintiff must show "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021
(11th Cir. 1994). The "causal link requirement" has been interpreted broadly to require merely that the plaintiff prove that protected activity and the adverse employment action are "not completely unrelated." Id. at 1021, citing EEOC v. ReichholdChem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. If this burden is satisfied, the plaintiff must then show that the employer's proffered reasons are a pretext for retaliation. Id.
Shepherd contends that she received the PIPs because she reported English's racial remarks to Clements. However, she did not present substantial evidence showing that there is some causal relationship between the complaints and the PIPs. Shepherd did not report English's racial remarks until after she had received the PIPs. She testified that she and English had an altercation approximately two weeks before she received her first PIP. However, she never stated that English made any racial remarks during this altercation or at any other time before she received her first PIP. At that time, she did complain to Clements about English's referring to himself as "the MFIC" and about being rushed in performing her job. Shepherd never offered any evidence showing that his reference to himself as "MFIC" was in any way a racial remark, and although his profane language cannot be condoned, we do not construe it as a racial remark.
Shepherd testified that she received the second PIP approximately one hour after English said "that's why I don't like niggers." When she discussed the PIP with Clements, she informed Clements that English had made racial remarks to her. In thoroughly reviewing Shepherd's affidavit and deposition testimony, we think it clear that the first time she ever complained about English's use of racial remarks was when she was receiving her second PIP. Thus, the *Page 693 
adverse employment actions could not be related to her statutorily protected expression. She did not produce substantial evidence to defeat Summit's motion for a summary judgment on her claim of retaliation, because she did not produce substantial evidence to prove her prima facie case. Therefore, the summary judgment must be affirmed as to her claim of retaliation.[2]
Shepherd contends that the summary judgment on her claim of constructive discharge should be reversed. Constructive discharge is a cognizable claim under Title VII and has been summarized as follows:
 " '[I]f the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee."'
Calcote v. Texas Educational Foundation, Inc., 578 F.2d 95, 97
(5th Cir. 1978), quoting Young v. Southwestern Savings Loan.Ass'n, 509 F.2d 140, 144 (5th Cir. 1975). However, this conduct does not create a cause of action under Title VII unless the employer's actions are directed at the employee because of her race, sex, creed, or national origin. Robertson. v. Alabama Dep'tof Economic Community Affairs, 902 F. Supp. 1473 (M.D.Ala. 1995).
Shepherd claims that she was forced to resign because of her working conditions. She argues that she was written up whenever she complained about English, that English used profanity and racial slurs and was never disciplined for doing so, and that she was instructed that she had to "get along" with him. She stated in her affidavit that when she submitted her resignation letter on August 31, 1996, she did not know that Phillips was returning to Wood Springs to resume his position as maintenance supervisor. However, she had testified in her deposition that Phillips returned to Wood Springs approximately three to four weeks before she left, and she had also testified that he had been scheduled to return to Wood Springs earlier that summer. If Shepherd knew that English was leaving and Phillips was returning, her claim that she was constructively discharged because of the conditions created by working for English must fail. A party cannot directly contradict prior sworn testimony to preclude the entry of a summary judgment. Continental Eagle Corp. v. Mokrzycki,611 So.2d 313 (Ala. 1992). Her affidavit testimony directly contradicts her deposition testimony that Phillips returned three to four weeks before she left, because she also testified that her last day working at Wood Springs was September 5, 1995. Because Shepherd knew Phillips was returning, and because in fact he did return to Wood Springs and became her supervisor before she submitted her resignation, her claim that she was forced to resign because of the conditions created by working for English must fail. Even if Shepherd did not know Phillips was returning to Wood Springs, the summary judgment was proper because Shepherd failed to meet her burden of presenting substantial evidence to show that her employer deliberately made her working conditions so intolerable that she would be forced to resign. In addition, we reject Shepherd's contention that the failure to promote her to a leasing position gives rise to a constructive discharge claim under Title VII, because she failed to show she was qualified for that position.
We next address Shepherd's "hostile environment" claim. To establish a claim of hostile environment, the plaintiff must show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her race; (4) that the harassment affected a term, condition, or privilege of employment; and (5) the existence of respondeat superior liability. Robertson, supra. *Page 694 
"When the workplace is permeated with `discriminatory intimidation, ridicule, and insult,' . . . that is `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated." Harris v. Forklift Systems, Inc.,510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993), quotingMeritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67,106 S. Ct. 2399, 91 L.Ed.2d 49 (1986). As the United States Supreme Court has explained:
 "[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee, . . . does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview."
Harris, supra, at 21, 114 S. Ct. 367. In determining whether an environment is "hostile" or "abusive," one must look at all the circumstances, including the "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, supra, at 23,114 S. Ct. 367.
Viewing the evidence in the light most favorable to Shepherd, we determine that she failed to satisfy her burden of showing that the alleged harassment was sufficiently pervasive to alter her conditions of employment and create an abusive working environment. She testified that English made two racial remarks. As to the remainder of her complaints against English, including his attitude and his use of profanity, Shepherd has not presented evidence indicating that these were in any way related to her race. English's alleged conduct, including his two racial statements or "offensive utterances," is not severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. Therefore, the summary judgment is affirmed as to her hostile environment claim.
Finally, Shepherd contends that the trial court erred in entering the summary judgment as to her outrage claim. To establish the tort of outrage, the plaintiff must show that (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) the distress was severe. Harris v. McDavid, 553 So.2d 567 (Ala. 1989). The conduct alleged must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Id. at 570; citing American Road ServiceCo. v. Inmon, 394 So.2d 361, 365 (Ala. 1980). The conduct alleged by Shepherd does not rise to the level of conduct required to establish a claim of outrage. Therefore, the summary judgment was properly entered as to this claim also.
AFFIRMED.
ROBERTSON, P.J., and YATES, CRAWLEY, and THOMPSON, JJ., concur.
[1] we note that one week before June 16 would have been June 9, the day Shepherd signed her action plan regarding the first PIP. Shepherd also testified that the altercation occurred on June 16 1995.
[2] Shepherd contends that her PIPs affected Clements's decision not to promote her to leasing representative. Clements testified that even if Shepherd had been qualified for the position, she would not have promoted her, because of her employment record, including her PIPs. Because Shepherd was not qualified for the position, Clements's hypothetical statement was mere speculation, which cannot be used to defeat a properly supported motion for a summary judgment. Hurst v. Alabama PowerCo., 675 So.2d 397 (Ala. 1996).