Herman E. CALCOTE, Plaintiff-Appellee,

v.

TEXAS EDUCATIONAL FOUNDATION, INC., a non-profit corporation, d/b/a Gary Job Corps Center, Defendant-Appellant.

No. 76–3223.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1978.

Morgan Hunter, Beverly Brook Brown, Austin, Tex., for defendant-appellant.

Luis M. Segura, San Antonio, Tex., for plaintiff-appellee.

Before GODBOLD, SIMPSON and MORGAN, Circuit Judges. .

GODBOLD, Circuit Judge:

Plaintiff Calcote, a white, sued his former employer, Texas Educational Foundation, Inc., charging racial discrimination in violation of Tit. VII.[1] The foundation is a non-profit corporation which under contract with the federal government operates "Job Corps" centers at which underprivileged

1. 42 U.S.C. § 2000e–2.

and minority youths are given vocational and academic training. The district court found that the Foundation had discriminated against Calcote because of his race, in his starting salary and in his merit pay increase, and that Calcote, who resigned, had been constructively discharged. The court granted back pay and attorney fees.

We affirm on the opinion of the district court, as supplemented and amended by this opinion. The underlying findings of fact are set out at length in the opinion of the district court. On this appeal the Foundation does not to any substantial extent question the underlying findings of fact but rather attacks the court's conclusions drawn from them. Plainly Calcote made out a prima facie case of racial discrimination, and the burden shifted to the Foundation to refute it by a preponderance of evidence showing legitimate, non-discriminatory reasons. *Turner v. Texas Instruments*, 555 F.2d 1251, 1256 (C.A.5, 1977). The facts adequately support the inferences drawn by the trial court that the Foundation was racially motivated in setting Calcote's original salary and in setting the amount of his merit pay increase and that Calcote's working conditions were made intolerable by these discriminations in pay and the harassment inflicted upon him by supervisor Dancy on racial grounds, so that Calcote was constructively discharged.

With respect to the issue of discrimination against Calcote in starting salary, under the undisputed testimony of defendant's personnel manager McClure, initial hiring classifications were based upon the applicant's training and experience. Under these standards Calcote, hired as a residential counselor at $900 per month,[2] was entitled to a higher classification than Archie David, a black, who was employed shortly before Calcote and given the higher classification of vocational counselor at $950 per month. McClure attempted to explain the differences in classification and salary on the ground that David was hired earlier and when Calcote was hired no position as voca-

tional counselor was open. The difficulty with this is that a few days after Calcote complained to EEOC of racial discrimination in the setting of his salary David's salary was reduced to approximately that of Calcote, and the explanation given for this is that there had been a "regrettable error" in setting David's salary when he was employed. In these circumstances the district court was entitled to, and impliedly did, reject time of employment and availability of positions as valid explanations for the disparities between Calcote and David and to infer that the disparities were racially motivated.

Other evidence supports the court's conclusion of racial motivation in treatment accorded Calcote in the terms of his hire. Approximately three months after Calcote was employed as a residential counselor at $900 per month, the Foundation hired a black, DeShay, also as residential counselor, at $1,025 per month. His training and experience were less than Calcote's.

Ten months after Calcote was hired the Foundation eliminated the two job classifications of vocational and residential counselor and merged them into a single classification called simply "counselor" and assigned to this new position the salary schedule previously followed for residential counselors. The revamping was arguably neutral to this point, although the Foundation acknowledges that the dual classification previously employed may have been illogical and unwise, but, as part of the revamping those persons formerly vocational counselors, including David, were permitted to retain their salary schedules, which were higher because of their previous classifications as vocational counselors. In short, Calcote and other residential counselors were frozen into their lower pay scale while the vocational counselors, including David and other blacks, kept their higher scale. The only purported explanation for this disparity is testimony that upon reclassification everyone was permitted to keep his prior salary level so long as he was making

---

2. The district judge found that Calcote was promised $950 per month but when he reported for work he was told his salary would be $900. He sought an explanation but was given none.

the minimum for the new job classification. This was merely a restatement of what occurred and not an explanation of the reason.

With respect to disparate treatment in merit pay increase, no explanation was given of why Calcote, who received a higher performance rating than David, was given a smaller pay increase, or of why, in Calcote's case and contrary to usual practice, the recommendation of his supervisor was overridden at a higher level. The written recommendation of Calcote's supervisor had been changed, and the change bore the initials of a white personnel officer, but the evidence is silent on the personnel officer's reasons for departing from usual practice.

Calcote's claim of constructive discharge was based upon the salary and merit pay discrepancies already discussed and upon alleged harassment by Ras Dancy, a black supervisor. The court found that Dancy did harass Calcote in several aspects, as described in findings 23 through 27. An additional and undisputed fact not noted by the district judge is that the meeting of counselors held for the purpose of writing a letter to assist former supervisor Wilson, a white, who had been fired and replaced by Dancy, was held with the knowledge and approval of the personnel officer who was himself present. Also Calcote was one of a committee that drafted the letter of recommendation and prepared the inscription for a plaque which the counselors gave to former supervisor Wilson.

The deficiency report incident deserves further discussion. Dancy had a deficiency report placed in Calcote's file stating that Calcote had been absent from the project eating a meal when he should have been on duty. The court accepted the testimony of Calcote concerning this matter. Calcote was deeply concerned about the report because he thought it would adversely affect his future as a professional counselor. He talked with Dancy and explained that he was not improperly off the project at the time Dancy reported him absent. Dancy acknowledged he only assumed that Calcote had no authority to be off the project and

promised to check into the matter. Dancy did nothing, and Calcote made two additional requests of Dancy, but Dancy never took any action.

After working three months under Dancy's supervision Calcote resigned despite urgings by the assistant personnel director that he complain to EEOC of racial discrimination rather than resign.

With respect to Dancy's attitudes toward whites in general, the testimony was in conflict. The district judge, however, considered that the testimony of Wilton Lomax, a former counselor who had worked under Dancy at the job center and was the only disinterested witness, tipped the balance. The judge accepted Lomax's testimony that Dancy was a racist who tried to "cut down" whites, talked down to them for no apparent reason, seemed to be "playing with" them, and was obsessed with "getting even" with all whites.

■ In Tit. VII cases this circuit and others have drawn from NLRB cases the constructive discharge doctrine:

> . . . [I]f the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (C.A.5, 1975). *See also Muller v. United States Steel Corp.,* 509 F.2d 923 (CA10), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Thompson v. McDonnell Douglas,* 416 F.Supp. 972 (E.D.Mo.,1976); EEOC Decision No's 74–05, July 13, 1973; No. 71–1413, Mar. 12, 1971; No. 72–0779, Dec. 30, 1971; No. 71–1545, Mar. 30, 1971; No. 72–0661, Dec. 27, 1971; No. 72–1100, Feb. 17, 1972. The district judge in his "Discussion" did not use the word "deliberately" or "intentionally" in describing the constructive discharge doctrine, although the authorities he referred to contain that requirement. In his Conclusions of Law he held that "Plaintiff was constructively discharged by defendant as a

result of the latter's making working conditions intolerable by allowing the violations of Title VII noted above." The defendant is a corporation which can only operate through its authorized personnel. The decision concerning Calcote's starting classification was made in the personnel office. The decision concerning his initial salary (reduced from $950 to $900) was made by someone further up the hierarchy than the person who interviewed Calcote in the personnel office. The decision to give Calcote a lower merit pay increase than his supervisor recommended was made by the personnel officer, either on his own or on the instruction of someone with more authority than he. With respect to the acts of Dancy specifically directed at Calcote, Dancy was Calcote's supervisor, and the acts done by him were within the course of his duties as supervisor. This alone would, we think, support a finding that Dancy's acts were "deliberate" acts of the Foundation. We also note, however, that the incident at the counselors' meeting occurred in the presence of the personnel officer, and Calcote took up with the personnel office the matter of the deficiency report's having been placed in his file by Dancy.

We think the Conclusions of Law of the district court should be expanded to reflect in Conclusion 3 that the actions which caused Calcote's working conditions to be intolerable were deliberate.

The Foundation has not attacked the award or the amount of attorney fees. In any event, in a Tit. VII case the award of attorney fees to the successful plaintiff is discretionary with the court. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648, 654 (1978); *Johnson v. Georgia Highway Express*, 488 F.2d 714 (C.A.5, 1974); *Adams v. Reed*, 567 F.2d 1283 (C.A.5, 1978).

The judgment of the district court is AFFIRMED.