[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 20, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-10753

_____

D. C. Docket No. 03-00194-CV-1-WS

NORMAN E. ROWELL,

Plaintiff-Appellant,

versus

BELLSOUTH CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(December 20, 2005)

Before CARNES and PRYOR, Circuit Judges, and FORRESTER[*], District Judge.

FORRESTER, District Judge:

_____

[*]Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

Plaintiff, Norman E. Rowell, filed suit against BellSouth Corporation ("BellSouth")[1] pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, contending that due to his age, BellSouth forced him to retire during a reduction in force. The district court found that Rowell's claim was meritless because he could not show that BellSouth constructively discharged him, and therefore Rowell did not suffer an adverse employment action. On appeal, Rowell contends that the district court erred in holding that a reasonable person would not have felt compelled to accept the voluntary severance plan offered by BellSouth because Rowell was convinced that if he did not accept voluntary severance, he would be terminated involuntarily.

Rowell was hired as a lineman by BellSouth in 1973. He later became a lineman foreman, a position he held until his retirement in 2002. In May 2002, BellSouth announced that it would undertake reduction in force of its management personnel. Rowell's supervisor explained that the reduction in force would take place in two stages. First, an enhanced voluntary package would be offered to employees. Depending on his years in service, if an employee accepted early retirement, he could receive a minimum of 50% and a maximum of 150% of his

---

[1]BellSouth asserts that the proper named Defendant is BellSouth Telecommunications, Inc., and that the district court entered a scheduling order directing the correction of the Defendant's name. We have not located such an order and thus continue to refer to Defendant as BellSouth Corporation.

base salary, as well as other benefits. At the conclusion of the voluntary program, if not enough employees had retired, BellSouth would institute a second stage, involuntary reduction program to meet its workforce goals. The involuntary program would offer a minimum of 15% and a maximum of 100% of an employee's salary and reduced additional benefits.

To implement the reduction in force, BellSouth employees were divided into "universes," which were groups of employees with similar job descriptions. Rowell, age 52 at the time of the reduction, was in a universe with five other employees: Greg Sharpe, age thirty-seven; Ferdinand Williams, age forty; Doug Farnell, age fifty-three; Billy James, age thirty-one; and Gwen DeValk, age forty-seven. BellSouth determined that two positions in Rowell's universe would be eliminated. To be prepared in the event that additional cuts were needed at the second stage, BellSouth instructed managers to begin ranking and rating employees on each of six competency factors. The six factors were (1) Demonstrates Broad Business Knowledge and Savvy; (2) Achieves Results Through Speed and Decisiveness; (3) Maintains a Focus on Customer Satisfaction; (4) Instills Purpose and Vision; (5) Communicates Openly and Effectively; and (6) Builds High Performing Teams and Individual Talent.

If necessary, a certain number of the lowest ranking employees in each universe would then be cut during the involuntary second stage. All employees, including Rowell, were informed that depending on the number of employees that accepted the voluntary retirement in the first stage, it was possible that enough new job openings would be created so that an employee whose position was eliminated after the voluntary phase could be transferred within the company. Specifically, Les Durel, a manager in Rowell's chain of supervision, informed employees that it was likely that there would be positions available in Mississippi because the company was eliminating some part-time contract positions there and would need full-time hires to replace them. During the initial stages of the reduction in force, immediate supervisors were told not to disclose the actual ratings given to managers in the universe they ranked, but they were permitted to give managers an idea of whether they were at risk so that a manager could decide whether to take the voluntary package.

Rowell and Ferdinand Williams received the lowest scores in Rowell's universe. *See* Rowell Depo., at 76-78. Doug Farnell, a year older than Rowell, received a score sufficient to place him in the top four positions in the group. Rowell then asked Carl Robitzsch, his immediate supervisor, whether he "needed to be looking for a job elsewhere," to which Robitzsch, responded, "yes." *See id.*

4

at 69-70 (Rowell testified he told Robitzsch, "I'm one of the kind of guys I just want to know. I don't want to sit here and think about it, I want to know . . . was I one of the ones that needed to be looking for a job elsewhere, and he told me I was."). Rowell also testified that he and Robitzsch did have a discussion about "the potential for any jobs opening up elsewhere." *Id.* at 70-71. After speaking to the other members in his universe, Rowell learned that Williams would be taking early retirement but that Sharpe, Farnell, and James would not. Rowell never learned what DeValk intended to do. *See id.* at 76-77, 80-82.

When Rowell received the papers for the voluntary early retirement offer in mid-August 2002, he reviewed them carefully and even discussed them with his attorney. *See id.* at 51. He further testified that no one forced him to take the voluntary retirement and that he could have rejected the offer and taken his chances on finding something else within the company. *See id.* at 57-58, 75. He had no reason to believe he could not have been a candidate for the additional job openings that might be created by the voluntary first stage. *See id.* at 78-79, 118-19. In fact, Rowell asked Robitzsch to inform him if any other job openings became available at BellSouth. *See id.* at 70-71, 74.[2] After talking over his

---

[2]Robitzsch did not do so, but positions were not open until after the first phase closed. By that point, Rowell had already accepted the voluntary early retirement package, and Robitzsch would have had no reason to inform Rowell of any job openings.

5

options with his attorney, Rowell signed the papers to accept the voluntary early retirement on September 6, 2002. *See id.* at 74-75. As part of his acceptance, he signed a waiver releasing any and all claims against BellSouth except for an ADEA claim. *See id.* at 86-88.

Rowell was separated on September 30, 2002 and received $91,500 in severance pay under the voluntary program. He also received a lump sum pension benefit of $188,000 because he was eligible for retirement. Rowell testified that because of the success of the voluntary program, he now understood that sufficient vacancies were created that he likely would have been able to transfer within BellSouth had he wanted to continue his employment. *See id.* at 122-23.

In support of his claim for age discrimination, Rowell testified that he believed Robitzsch had discriminated against him during the ranking process. *See id.* at 102. Rowell admitted, however, that other than the ranking scores, Robitzsch had never said or done anything to suggest he would discriminate on the basis of age. *See id.* at 103-04. Rowell also did not believe any other BellSouth employee discriminated against him. *See id.* at 104. He did not want to risk losing the half a year's pay that was only available to those who took the voluntary early retirement. *See id.* at 115.

The district court concluded that Rowell could not show he was constructively discharged because he could not have reasonably believed his only choices were retirement or discharge. The court recognized that Rowell's choice may have been a difficult one, but it was not "no choice" at all. Because the district court found that Rowell could not establish an adverse employment action, the court did not consider Rowell's alternative argument that he could establish BellSouth's legitimate nondiscriminatory reasons for the ranking were pretextual. Rowell then filed the instant appeal.

Although the district court found that Rowell failed to establish a prima facie case of age discrimination because he could not demonstrate he was constructively discharged, we may affirm the district court "on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below." *Powers v. United States*, 996 F.2d 1121, 1123-24 (11th Cir. 1993). Many courts, in reduction-in-force cases, begin by considering whether it is being done in an age neutral way, presumably because a reduction in force generates adverse employment actions, which of course are quite lawful if not based on impermissible characteristics such as age. As the parties have briefed the contention that BellSouth discriminated against Rowell on the basis of age, we will begin at this point.

7

We review the grant of summary judgment *de novo* viewing the facts and drawing all reasonable inferences in favor of the nonmoving party.  The "ADEA makes it 'unlawful for an employer to fail to hire or to discharge any individual or otherwise discriminate against an individual . . . because of that individual's age.'" *See Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting 29 U.S.C. § 623(a)(1)).

In *Williams v. General Motors Corp.*, 656 F.2d 120 (5th Cir. Unit B Sept. 1981), we applied the prima face case of age discrimination to a reduction in force case and found the elements to be a plaintiff who is (1) within the protected age group, (2) adversely affected, (3) qualified to assume another position at the time of discharge, and (4) "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Id.* at 129.  To satisfy the last  prong, we elaborated that the "plaintiff [must] produce some evidence that an employer has not treated age neutrally, but has instead discriminated based upon it.  Specifically, the evidence must lead the factfinder reasonably to conclude either that the defendant (1) consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) regarded age as a negative factor in such consideration." *Id.* at 129-30. We noted, for example, that a plaintiff could present circumstantial statistical

evidence regarding age; or evidence that the employer's plan was subterfuge for discrimination, such as evidence that an employee-rotation plan existed which shifted protected workers into jobs most likely to be cut in the reduction in force. *Id.* at 130.

Rowell is within the protected age group, and because no one has argued otherwise, we assume that he was qualified to take another position at the time he accepted the voluntary early retirement package. Rowell contends that the competency rankings conducted by Robitzsch were discriminatory because (1) they did not take into consideration the employees' training, experience or job performance, (2) he received higher scores on his October 2001 and February 2002 evaluations than his evaluation done in August 2002 in preparation for the reduction in force, (3) he was better qualified for his job than Greg Sharpe, age thirty-nine, and Billy James, age thirty-one; and (4) Cathy McIntosh and Norman Robbins, other BellSouth employees, testified that they believed their rankings were impermissibly based on age.

Rowell takes issue with the six categories of competency rankings because they did not account for training, experience, or job performance. Rowell does not contend that the six categories were selected as a subterfuge or code for achieving a younger work force; rather, he simply believes that they were not the appropriate

categories on which to rank employees. It is by now axiomatic that we cannot secondguess the business decisions of an employer. *See*, *e.g.*, *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004). BellSouth determined that these six areas were of greatest importance. Rowell did not develop any evidence to demonstrate that the selection or application of these categories would result in discrimination on the basis of age. Furthermore, only four of the six competency areas used in the reduction in force were also used in the regular job performance evaluations conducted by BellSouth. Thus, that Rowell received different scores on his annual review and the review done for purposes of reduction does not provide evidence of discriminatory animus. The facts that the annual evaluations covered only that year's performance whereas the reduction in force evaluations were to take into consideration the employee's whole experience also make the comparison not relevant for purposes of determining whether there was discriminatory intent.

Rowell next contends that he was better qualified than Sharpe and James. Sharpe had been employed by BellSouth for thirteen years and served as a network manager for five years at the time of the reduction in force. James had worked for BellSouth for five years and had been promoted to network manager in September 2001. Rowell believed he was more qualified than James and Sharpe because he

had more job experience, knowledge of outside plant equipment and procedures, BellSouth "schooling," and knowledge of quality and safety issues. These factors, however, were not relevant to the competency ratings. Furthermore, Rowell's personal belief that he was more qualified is not sufficient to demonstrate discriminatory intent. *See*, *e.g.*, *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253-54 (11th Cir. 2000). Moreover, Sharpe and James were not the only other individuals in Rowell's universe, and thus a discussion of their qualifications is not reflective of what happened in Rowell's entire universe.

In fact, there is no obvious correlation between age and ranking in Rowell's universe. The people in Rowell's universe were ranked as follows:

| Name | Age | Rank |
|------|-----|------|
| James | 31 | 3.333 |
| Sharpe | 37 | 3.500 |
| Williams | 40 | 3.000 |
| DeValk | 47 | 3.667 |
| Rowell | 52 | 3.000 |
| Farnell | 53 | 3.167 |

Rowell and Williams, one of the younger individuals in the universe, received the lowest scores, and at least one of the four higher scorers, Doug Farnell, was older than Rowell.

Finally, McIntosh and Robbins were in different universes than Rowell, and thus, their testimony would not tend to show that BellSouth treated Rowell in a

discriminatory manner. For example, McIntosh testified that her manager, Carla Little, performed the competency ratings for six employees in McIntosh's universe of thirteen people. Of those six employees, four got together to discuss their rankings and discovered that the rankings correlated with seniority, not necessarily age, for these four employees. McIntosh's statements about the rankings of only four people out of a universe of thirteen, however, cannot have any relevance for what happened in her universe, let alone Rowell's.

Robbins testified that he met with his supervisor, Everett Gillis, several times about whether he was at risk in the involuntary reduction. During a conversation with Gillis about which employees would be let go in the reduction, Rowell's name came up. *See* Robbins Depo., at 14. Gillis said Rowell and others at risk, including Robbins, would be let go "due to how it was rated and w[h]ere we fell out in the rating." *Id.* at 14-15. Later in the conversation, Gillis told Robbins "it was more based on age." *Id.* at 15. He did not tell Robbins what led him to believe that or what gave him that information. *Id.* During a separate conversation about the reduction in force, Gillis told Robbins that "a lot of the decision is based on that the company wants to keep the youth. And because of my age, it was detrimental to me." *Id.* at 20. Again, Gillis did not tell Robbins where he got that information. *Id.* at 20. Robbins testified that Gillis told him the

12

company wanted youth for "really vague superfluous ideas that [Gillis] had. It was more like costs less, less insurance and stuff like that. And they can develop them in what they wanted them to do." *Id.* at 20-21. Robbins was then asked whether "it was your impression that Mr. Gillis was reflecting his own personal opinion, or whether he was somehow telling what he had been told by some senior person or upper management as far as these references to age playing some part in how people were being rated during the reduction in force?" *Id.* at 40. Robbins responded: "It was [Gillis'] personal opinion." *Id.* at 40, 45. Robbins also testified that Gillis pointed only to himself as the basis for the comments that the company wanted to keep youth. *Id.* at 41.

On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form. *See Mecuba v. Deboer*, 193 F.3d 1316, 1324-25 (11th Cir. 1999) (although evidence that is otherwise admissible may be accepted in an inadmissible form at summary judgment stage, hearsay could not be reduced to admissible form). If it is to be contended that Gillis's statements represent the policy of BellSouth, Federal Rule of Evidence 801(d)(2)(D) might make the statement admissible. That rule states that a statement is not hearsay if the "statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of

13

the agency or employment, made during the existence of the relationship." *Id.* Under Rule 104, a court would have to determine by a preponderance of the evidence that Gillis was speaking as an agent of BellSouth at the time he made these statements. Nothing in Robbins' testimony, however, supports such a conclusion. It is in reality nothing but the inadmissible opinion of Gillis.

It is true that courts have admitted statements of managers under Rule 801(d)(2)(D) where there is some evidence that the statements reflected some kind of participation in the employment decision or policy of the employer. *See*, *e.g.*, *Yates v. Rexton, Inc.*, 267 F.3d 793 (8th Cir. 2001); *Woodman v. Haemonetics Corp.*, 51 F.3d 1087 (1st Cir. 1995). These cases, however, are distinguishable. In *Yates*, the plaintiff was terminated at age 68 as part of a reduction in force. 267 F.3d at 798. The plaintiff proffered evidence that two executives of his employer's parent company "were of the opinion that employees over age 60 should retire." *Id.* at 797. The record also reflected that these executives exerted pressure on the plaintiff's chain of supervisors to terminate the plaintiff's employment. The Eighth Circuit held that even if these two executives did not play a role in the plaintiff's termination, their statements were admissible under Rule 801(d)(2)(D) because "'[s]ignificant involvement, either as advisor or other participant in a process leading to a challenged decision,' may be sufficient to

14

establish agency under Rule 801(d)(2)(D)." *Id.* at 802 (quoting *Equal Employment Opportunity Comm'n v. Watergate at Landmark Condo.*, 24 F.3d 635, 640 (4th Cir. 1994)).

In *Woodman*, the plaintiff was also terminated as a result of a reduction in force. The plaintiff proffered testimony that his supervisor had attended a meeting with the company's upper management at which they discussed future employee terminations. Following the meeting and referencing the discussion about terminations, the supervisor made the comment, "These damn people – they want younger people here." 51 F.3d at 1089-90. The defendant argued that the supervisor's statement was not admissible under Rule 801(d)(2)(D) because she was only a "first line" supervisor with no authority to make termination decisions. The court held, however, that her statement was admissible because she had attended the meeting in the scope of her employment and evaluated employees, including recommending the plaintiff's termination. Thus, the court found, she was directly involved in the reduction in force. *Id.* at 1094.

Here, in contrast, there is no evidence that Gillis was involved in the decisions of how to structure the reduction in force or how to design the performance evaluations used during the involuntary stage of the reduction. There is also no evidence that Gillis had received any information from BellSouth's

upper management to indicate that age was to play a factor in these decisions. Rather, the only evidence before the court is Robbins' testimony that Gillis' statements were Gillis' own "personal opinion" and **not** something that Gillis had been told by upper management about the role age was to play in the performance ratings. *See* Robbins Depo., at 40, 45. In fact, Gillis only pointed to himself as the basis for his comments that the company wanted to keep youth. *Id.* at 41. Significantly, not only did Robbins testify that Gillis' comments reflected only Gillis' opinion, Robbins was not able to identify any particular person in BellSouth to whom Gillis could point as the basis for his comments. *Cf. Carden v. Westinghouse Electric Corp.*, 850 F.2d 996, 1002 (3d Cir. 1988) (excluding testimony under Rule 801(d)(2)(D) where supervisor only stated to plaintiff that "they" wanted a younger person for the job and the record did not establish a foundation as to the identity of "they").

We find Gillis' testimony similar to that which we rejected in *Mitchell v. USBI Co.*, 186 F.3d 1352 (11th Cir. 1999). There, the employer engaged in a reduction in force of its engineers because a contract with NASA had been cancelled. *Id.* at 1353. After the layoff list was developed, managers worked with members of the company's human resources department to determine whether any of those slated for layoff were eligible to "bump" other employees. Under the

layoff policy, a more senior employee could bump a less senior employee if the senior employee had the requisite qualifications to perform the less senior's job. *Id.* The plaintiff was on the layoff list and the company determined that he could not bump any of the twenty less senior employees because he did not have the requisite qualifications. Although it was unclear the role performance evaluations played in the layoff process, the plaintiff proffered testimony that his supervisor had given younger employers higher evaluations in order to increase their salaries and encourage them to stay with the company. *Id.* at 1354. For the purposes of summary judgment, we assumed that the evaluations played a role in the layoff process. As the district court, we assumed that the plaintiff could establish a prima facie case of discrimination. We then rejected his arguments as to why the employer's legitimate non-discriminatory reason for layoff was pretextual. The plaintiff argued that "comments by various USBI employees demonstrate a corporate culture conducive to age discrimination." *Id.* at 1355. He also pointed to comments of a manager, Frank Batty, but conceded he did not participate in the decision to terminate him. The plaintiff also asserted that another manager had suggested that "the layoffs were aimed at the employees who were more secure and did not have young children in school." *Id.* Again, however, we noted that

17

this manager was not a decisionmaker. As such, we did not accept the comments of either manager as to be even circumstantial evidence of discrimination. *Id.*

Similarly, we find that Rowell has not proffered any evidence to show that Gillis' statements reflect any policy of BellSouth, and since Gillis was not a decisionmaker with respect to Rowell, his statements cannot demonstrate discriminatory intent. *See Steger v. General Electric Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) ("statements made by nondecisionmakers or statements made by decisionmakers unrelated to the decisional process" do not demonstrate discriminatory intent) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

Under *Williams*, Rowell would have to show that BellSouth either (1) consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) regarded age as a negative factor in its actions. Clearly, Rowell cannot show that BellSouth refused to consider relocating him. Robitzsch and Durel both informed employees that if enough individuals accepted voluntary early retirement, jobs would become available in other areas of the company. Rowell does not dispute that he would have been eligible and that no one at BellSouth informed him he would not be able to apply for those positions. Next, as discussed above, none of the other evidence pointed to by Rowell is sufficient

18

evidence from which a reasonable jury could conclude that BellSouth regarded age as a negative factor during the reduction in force.

Based on the foregoing, we conclude that Rowell has not presented any evidence "from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Williams*, 656 F.2d at 129.

In any event, we would also affirm the district court's order finding that Rowell could not establish he was constructively discharged from his position. In *Young v. Southwestern Savings & Loan Association*, 509 F.2d 140 (5th Cir. 1975), we adopted the standard for determining whether an employee has been constructively discharged from the National Labor Relation Board's constructive discharge doctrine. There, the plaintiff resigned after learning that she was expected to attend mandatory meetings that began with a short religious talk and prayer delivered by a minister. We stated that the "general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for an illegal conduct involved therein as if it had formally discharged the aggrieved employer." *Id.* at 144 (citing *NLRB v. Brennan's Inc.*, 366 F.2d 560 (5th Cir. 1966)); *see also*

*Calcote v. Texas Educational Foundation, Inc.*, 578 F.2d 95 (5th Cir. 1978) (applying same standard to race discrimination claim); *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61 (5th Cir. 1980) (in equal pay sex discrimination claim, referring to *Young* and holding that constructive discharge occurs where "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign").

In *Downey v. Southern Natural Gas Company*, 649 F.2d 302 (5th Cir. Unit B June 1981), we addressed for the first time the issue of constructive discharge in the context of a job elimination age discrimination suit. There, the plaintiff, a sixty-one-year-old longtime employee, had sought a transfer to a new facility. He did not receive the job but later learned that a thirty-three-year-old with only three years' experience had been selected. The plaintiff testified that the personnel director informed him he had not been chosen because he would only be at the facility for a few years before a replacement would have to be trained due to the plaintiff's advanced age. The personnel director also informed the plaintiff that "the company did not have anything else for him to do" and "he was in danger of being discharged because the company did not want to keep him around until the mandatory retirement age of seventy." Finally, he was told he would lose his

stock benefits if he were discharged by the company. Rather than risk the loss of these benefits, the plaintiff requested and was granted early retirement. *Id.* at 303. The plaintiff then filed suit under the ADEA, contending that he had been constructively discharged. Reversing the district court, we found that the test for constructive discharge is "whether a reasonable person in the employee's position would have felt compelled to resign." *Id.* at 305. Because the plaintiff asserted that "his superior specifically advised him that he might be discharged, with a consequent loss of benefits," we found that the claim of constructive discharge should have been presented to the jury. *Id.*

Because *Downey* addresses constructive discharge in the context of a job elimination age discrimination claim, it is more apt to the instant case than *Young*. However the doctrine is stated, it is still rooted in the notion that the discharge is the product of intolerable conditions. The holding in *Downey*, however, does not control Rowell's case as the facts in *Downey* differ in substantial ways. Most significantly, there was no reduction in force program in *Downey*. Thus, unlike the plaintiff in *Downey*, there is no evidence at all to show that Rowell was "singled out" for retirement. Furthermore, unlike the plaintiff in *Downey*, here, Rowell was never told "the company did not have anything else for him" or that BellSouth wanted to discharge him because it "did not want to keep him around

21

until the mandatory retirement age of seventy." Moreover, the only potential loss Rowell would face was receiving $61,500 in severance benefits as opposed to $91,500, while the plaintiff in *Downey* was told he would lose all of his stock benefits were he to be discharged rather than resign.

The Fifth Circuit did expound upon *Downey*'s impact in a companywide reduction in force in *Bodnar v. Synpol, Inc.*, 843 F.2d 190 (5th Cir. 1988). There, Synpol experienced economic difficulties and informed its employees that it would be reducing costs through normal retirement, an early retirement program, and a reorganization to eliminate some jobs. Employees had to meet certain age and seniority requirements to be eligible for the early retirement program. Of the twenty-eight employees offered retirement, twenty-one accepted the program. The seven who did not were still employed by Synpol. Three former employees who accepted the early retirement offer filed suit under the ADEA contending they had been constructively discharged.

To support their theory of constructive discharge, the plaintiffs argued that they were told if they did not participate in the early retirement program and their job was eliminated, they would not receive any severance pay or benefits. *Id.* at 192. They were not permitted to speak to other employees about whether to accept the program and were not provided any information as to how many

22

employees had been offered the program and who had accepted it. *Id.* Finally, the plaintiffs contended that presentations concerning the program had been made in a threatening manner. *Id.*

The Fifth Circuit, citing *Downey*, found that the test for constructive discharge was "whether a reasonable person in the employees' position would have felt compelled to resign under the circumstances." *Id.* While the court recognized that an early retirement program, itself, did not create a prima facie case of age discrimination, the "picture becomes more complicated . . . when the offer of early retirement irrevocably changes the employee's status quo" as the court discussed in *Downey*. *Id.* at 193. The Fifth Circuit noted, however, that *Downey* is not entirely "apposite [] because it involved a claimed unique discriminatory act rather than a plan offered to numerous employees." *Id*.

> An employer's 'offer' of early retirement may create a prima facie case of age discrimination by constructive discharge if it sufficiently alters the status quo that each choice facing the employee makes him worse off. Of course, no individual employee or employee group may claim constructive discharge where all employees are subject to the same working conditions.

*Id.* (citing *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 926 (5th Cir. 1982)).

Despite the fact that Synpol only offered the plan to nonessential, non-collective bargaining unit employees, the court found that the plaintiffs had not been "singled out" in the manner that the plaintiff in *Downey* had been. *Id.*

23

(noting that Synpol was bound by the terms of a collective bargaining contract with respect to the other employees). The court also rejected the plaintiffs' contention that the early retirement program was not voluntary because (1) they had a short time period to consider the offer, (2) supervisors threatened that "if not enough employees accepted early retirement and the offeree's job was eliminated he would not receive any severance pay or non-pension benefits," and (3) the tone and manner of those who explained the plan was intimidating. *Id.* Rather, the court found that "[n]one of these factors, taken singly or cumulatively, constitutes objective evidence that working conditions had become so intolerable as to force [] resignation." *Id.*

> Specifically, the court held
>
> [t]hat risk inhered in eligible employees' failure to accept the [early retirement program], the risk that their jobs might be eliminated because of economic pressure on the company, is likewise insufficient to suggest age discrimination. The element of risk distinguishes this case somewhat from the no-lose early retirement plan characterized in *Henn* [*v. National Geographic Society*, 819 F.2d 824 (7th Cir. 1987)], but [plaintiffs'] risk, if they stayed on, would be shared by all remaining employees of Synpol.

*Id.* at 194.

Similarly, in *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476 (1st Cir. 1993), the First Circuit reviewed Kodak's decision to downsize their operations in Puerto Rico through a voluntary separation program. Kodak informed employees that if

24

not enough individuals selected the voluntary separation, the company would be forced to reassign or furlough employees. *Id.* at 478. Two employees who accepted the voluntary separation later filed suit alleging age discrimination. *Id.* The plaintiffs attempted to demonstrate that their only choice was early retirement or discharge.

The court found that three factors reduced the seeming lack of choice in these two options: (1) Employees were notified that a sufficient number of takers would obviate the need for involuntary separation, (2) the employer did not indicate which employees would be terminated should that step prove necessary, and (3) the employer did not threaten to treat harshly anyone selected for involuntary termination. *Id.* at 480-81. Thus, the First Circuit rejected plaintiffs' argument, holding that "[m]ere offers for early retirement, even those that include attractive incentives designed to induce employees who might otherwise stay on the job to separate from the employer's service, do not transgress the ADEA." *Id.* at 480. To show that the early retirement offer was a constructive discharge, a plaintiff "must show that the offer was nothing more than a charade, that is, a subterfuge disguising the employer's desire to purge plaintiff from the ranks because of his age." *Id.* Constructive discharge occurs "when the offer presented was, at rock bottom, a choice between early retirement with benefits or discharge

without benefits, or, more starkly still, an impermissible take-it-or-leave-it choice between retirement or discharge." *Id.* (quotation and citation omitted).

This court has not addressed constructive discharge in any sort of systematic way in the context of a reduction in force to be accomplished in part by offering economic incentives to any covered employee who resigns. As noted, the doctrine of constructive discharge enables an employee who has resigned to demonstrate that he suffered an adverse employment action by showing that the resignation was an involuntary response that was the product of intolerable working conditions – that is that he had only a choice between retirement and discharge.

*Downey*'s reasonable man test is imprecise in a case where a fifty-two-year-old employee is offered a severance package of a year and one-half's salary plus the present value of his pension plan. Such a man may well think that the only reasonable response is to resign and take the package, but the motivation is purely economic. The earliest formulations of the doctrine of constructive discharge, however, have always required a showing that the resignation be the product of intolerable or very unpleasant working conditions apart from the influence of any additional economic benefit offered by the employer in which the employee had no vested right. *See, e.g., Young*, 509 F.2d 140 (finding constructive discharge

26

where employee resigned rather than attend mandatory company meetings that began with prayer). The *Downey* formulation on its face would permit the use of what is economically compelling to be conflated with the calculus of the likelihood that he can maintain the *status quo* – that he may remain employed.[3] The possibility of employment, as will be shown below, is the germane question in a determination of constructive discharge on facts such as these.

Though taking somewhat different approaches, the cases teach that where loss of a job is highly likely if the employee does not take the severance package, then a constructive discharge may be proven if it is also shown that the employee would have kept a job with the company and declined the severance package if given a choice. *See, e.g., Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1128 (6th Cir. 1998) (allowing constructive discharge claim to proceed where plaintiff proffered evidence that employer's offer of layoff with possibility of recall was illusory).

We know that in a reduction-in-force situation, some employees are going to lose their jobs. As a result, not everyone is in as good a position as the status quo regardless of the choices presented to them.

---

[3] If this were the law, the lesson for employers is that they should offer no extra-economic incentive in connection with reductions in force.

In order to show constructive discharge, however, the plaintiff must show that the situation was so "intolerable" that he had "no choice" but to take early retirement. The fact that one of the possible outcomes is that he would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge because the possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of "quit or be fired." *See generally Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1083 (11th Cir. 1990) (the "essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nonetheless have to be fired") (quotation and citation omitted); *Vega*, 3 F.3d at 480 (constructive discharge occurs "when the offer presented was, at rock bottom, a choice between early retirement with benefits or discharge *without benefits*, or, more starkly still, an impermissible take-it-or-leave-it choice between retirement or discharge" but mere fact that some employees might be furloughed if not enough accepted voluntary retirement was not sufficient) (emphasis added).

Rowell was never at the point where his only choices are between termination and resignation. In the beginning his options were:

1. Keep his present job or seek other openings within BellSouth, or

2. Resign with a severance package of 150% of his salary and his pension in lump sum.

After his conversation with Robitzsch, a reasonable person would feel less sure of keeping his present position, but it was still a possibility that one member of the universe might take the severance package, obviating altogether the need to move Rowell out of his present position. There was also the opportunity to seek any jobs that opened up, including some in Mississippi, the creation of which was not dependent on the success of the "buy-out" proposal. The choices for Rowell never get any more unpleasant; he is never in a position without an opportunity to continue his *status quo* employment with BellSouth.[4] Until it becomes evident that there is no objectively reasonable opportunity to remain employed, he cannot as a matter of law contend that he has been discharged.

Rowell was faced with a choice, a difficult one to be sure, but he chose to accept the maximum severance benefit over the possibility of remaining employed. That was a choice Rowell made with full information and cannot be described as a

---

[4]There is no question in this case about other possible positions being undesirable.

take-it-or-leave-it situation. An employee who accepts the severance package rather than wait to see if he can remain employed cannot claim that he was constructively discharged. *See Johnson v. Runyon*, 137 F.3d 1081, 1082 (8th Cir. 1998) (rejecting constructive discharge claim where plaintiff "chose to accept an early retirement package rather than to wait and see what positions would be available following the reorganization").

Because Rowell was not faced with an impermissible take-it-or-leave-it choice between retirement or discharge, we find that he cannot establish an adverse employment action of constructive discharge and his ADEA claim fails. Rowell has not established a prima facie case of employment discrimination, and thus, we need not consider BellSouth's alternative argument that Rowell failed to demonstrate that its legitimate, nondiscriminatory reasons for the competency rating were pretextual.

For these reasons, we AFFIRM the district court's grant of BellSouth's motion for summary judgment.

CARNES, Circuit Judge, concurring:

I concur in the Court's decision affirming the grant of summary judgment and join the part of its opinion explaining that Rowell failed to create a genuine issue of material fact that his ranking for reduction in force purposes was the result of age discrimination. The issue of whether Rowell's resignation amounted to a constructive discharge so as to satisfy the adverse employment action requirement is one that I would not reach, and I do not join in that alternative holding.