[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12927
Non-Argument Calendar
_____

D.C. Docket No. 4:14-cv-00440-RH-CAS

CHANTELLE DISHMAN,

Plaintiff-Appellant,

versus

STATE OF FLORIDA DEPARTMENT OF JUVENILE JUSTICE,

Defendant-Appellee.
_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(September 2, 2016)

Before MARTIN, JORDAN and JILL PRYOR, Circuit Judges.

PER CURIAM:

This case arises out of a decision by the State of Florida Department of

Juvenile Justice ("Department") not to promote its employee Chantelle Dishman.

After a white employee was selected for a promotion, Dishman, who is black, sued the Department alleging racial discrimination. The district court entered summary judgment in favor of the Department because Dishman failed to demonstrate that the Department's legitimate non-discriminatory reason for promoting the white employee was pretextual. We agree with the district court and therefore affirm.

## I.      Factual and Procedural Background

Dishman began working for the Department in 2000. She became the supervisor of the Department's Central Communications Center ("CCC"), which runs the hotline used to report all incidents involving youths under the agency's supervision, in 2007. When an incident is reported to the hotline, the CCC assigns the incident to another division for investigation. Dishman was responsible for supervising the CCC employees.

When the Department internally restructured and created an Incident Operations Center ("IOC") in 2013 as part of an effort to reform the Department's monitoring and management programs, the Department needed to fill the position of IOC director. The IOC director is responsible for overseeing the CCC supervisor and analysts from three other departments. The IOC director's responsibilities are broader than those of the CCC supervisor because the IOC director is responsible for not only ensuring the timely reporting of incidents but also identifying systemic issues and proposing improvements.

2

The responsibility of interviewing candidates for the IOC director position fell upon Robert Munson, the Department's Inspector General. Munson understood that although he was responsible for selecting the top two candidates, he lacked authority to make a final decision. Instead, either Alex Kelly, the Department's Chief of Staff, or Christy Daly, the Department's Deputy Secretary, had final say over the hiring of the IOC director.

Munson, as part of a panel of Department employees, interviewed five candidates for the IOC director position, including Dishman and Holly Johnson, a white Department employee responsible for overseeing the investigation of incidents reported to the hotline that occurred in Department facilities and residential units. The panel asked each candidate the same set of questions, and each panel member scored the candidates based upon their responses. When the scores were tabulated, Dishman received the highest score and Johnson the second highest.

After the interviews were completed, Munson told Dishman that she had received the highest score. Dishman claims that Munson also told her that she had been selected as IOC director. Munson denies telling Dishman that she had the job.

In a meeting after the interviews, Kelly and Munson discussed the interview process. When Kelly reviewed the questions the panel asked, he found that the

3

panel failed to ask about the skills required for success in the IOC director position. Although Kelly determined that the panel had identified the two top candidates, he decided that another round of interviews was necessary to evaluate whether Dishman or Johnson was the better candidate. Although Kelly claims he stated in this meeting that the interview questions were insufficient, Munson denies it.

Kelly, Daly, and another senior Department leader interviewed Dishman and Johnson. Kelly explained that the purpose of the interviews was to identify which candidate was better qualified across four criteria: subject matter knowledge; ability to communicate effectively to colleagues, program staff, and leadership; ability to be a change manager in human relations; and ability to be a change manager in the types and uses of data. Johnson outperformed Dishman in the second interview. Dishman repeatedly told the interviewers that she essentially was already performing the functions of the IOC director and failed to identify new ideas she would implement, while Johnson articulated ideas about how she would improve reporting and analysis of incidents. The interviewers unanimously selected Johnson for the position of IOC director.

Dishman sued the Department in Florida state court asserting a race discrimination claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e-2(a), and the Florida Civil Rights Act ("FCRA"), Fla. Stat.

4

§ 760.10(1)(a).[1]  After the Department removed the case to federal court and the parties completed discovery, the Department moved for summary judgment.  At a hearing, the district court orally granted the Department's summary judgment motion.  This is Dishman's appeal.

## II.    Standard of Review

We review a grant of summary judgment *de novo* and "draw all inferences and review all evidence in the light most favorable to the non-moving party," here Dishman.  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (internal quotation marks omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    Discussion

### A.    The *McDonnell-Douglas* Framework

Dishman alleges that she was terminated on the basis of race in violation of Title VII.  Because she relies on circumstantial evidence to prove her race

---

[1] Because the FCRA analysis mirrors that of Title VII, we need not address Dishman's FCRA claim separately.  *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

discrimination claim, we use the three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate her claim at the summary judgment stage.  *Underwood v. Perry Cty. Comm'n*, 431 F.3d 788, 794 (11th Cir. 2005).

At the first step of the *McDonnell-Douglas* framework, the plaintiff must "establish by a preponderance of the evidence a prima facie case of discrimination."  *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013). Because the Department concedes that Dishman established a prima facie case, we presume that race motivated the Department to select Johnson over Dishman for the IOC director position.  *See Smith v. Lockheed-Martin*, 644 F.3d 1321, 1325 (11th Cir. 2011).

At the second step, the employer must introduce evidence of "some legitimate, non-discriminatory reason" for its employment decision.  *Id.* (internal quotation marks omitted).  The Department met this burden by coming forward with evidence that it selected Johnson over Dishman because Johnson's performance at the second round of interviews showed she was more qualified. The Department also put forth a legitimate, non-discriminatory reason for adding a second round of interviews after Kelly discovered the first panel's questions failed to capture the position's role and responsibilities in the reorganized Department.

As such, the Department rebutted the presumption raised by the prima facie case. *See id.* at 1325-26.

At the third step, the employee must show that the employer's proffered reason is a "pretext for unlawful discrimination." *Id.* at 1326. To demonstrate pretext, an employee must show such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted). At this step, the employee must meet the employer's reason "head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

In some cases, the rejection of the defendant's proffered reasons and the elements of the prima facie case "will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (internal quotation marks omitted). In these cases, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.*; *see Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308-09 (11th Cir. 2012) ("If a plaintiff produces sufficient evidence that the employer's proffered reason is merely

pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer.").

But in other cases, establishing the falsity of the employer's stated reason will be insufficient to establish discrimination because "although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148.  To survive summary judgment, an employee must do more than establish the falsity of the employer's proffered reason when the employee "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 147.

Dishman sets forth a number of arguments about why the Department's proffered reasons for holding a second round of interviews and then selecting Johnson were pretextual.  Having carefully considered each of Dishman's arguments and the record, we conclude that no reasonable factfinder, viewing all the evidence in the light most favorable to Dishman, could determine that the Department's reasons were unworthy of credence.

Dishman first asserts that she established pretext because she was better qualified than Johnson for the position.  But Johnson and Dishman were in many ways similarly qualified:  each had prior supervisory experience in the Department

8

and a college degree.  Indeed, after interviewing each candidate, Munson's panel rated Dishman and Johnson similarly, with only a slight edge to Dishman.  "In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (alteration in original) (internal quotation marks omitted).  Instead, the plaintiff must prove that the disparity in qualifications was "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  *Id.* (internal quotation marks omitted); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005) ("It is by now axiomatic that we cannot second-guess the business decisions of an employer."). Simply put, we cannot say that the disparity in qualifications was so great that no reasonable person could have selected Johnson over Dishman.

Second, Dishman contends that Kelly's decision to abandon the original hiring process and hold another round of interviews is evidence of pretext.  But even if the Department changed its hiring process after the first round of interviews, an employer's failure to follow its own internal policies "does not necessarily indicate racial discrimination." *See Springer*, 509 F.3d at 1350.  Here, the Department set forth a legitimate, non-discriminatory reason why it added a

second round of interviews.  As Kelly explained, he added the second round of interviews because the questions asked by the first panel failed to reflect the responsibilities of the IOC director.[2]

Although Dishman argues that the Department has given shifting explanations why it added a second round of interviews and that the second round of interviews were added merely as a pretext to discriminate against her, we disagree.  Kelly's stated reason for adding a second round of interviews has remained consistent.  Moreover, the questions asked by the second interview panel addressed all the responsibilities of the IOC director, which further supports the conclusion that Kelly added the second round of interviews to determine who could better perform those responsibilities.

Dishman asserts that Kelly's testimony that he added a second round of interviews because he was unsatisfied with the questions asked in the first round is contradicted by Munson's testimony that there was always going to be a two-stage interview process.[3]  But the record does not support Dishman's position:  Munson

_____

[2] We acknowledge that there is a disputed issue of fact about whether Kelly told Munson that the first interview panel's questions were insufficient.  But this disputed issue of fact is immaterial because it does not rebut head on the Department's assertion that a second round of interviews was necessary because the questions the first panel asked were insufficient.  *See Chapman*, 229 F.3d at 1037.

[3] Dishman also contends that inconsistent testimony about who had the ultimate hiring authority for the IOC director position calls into question the Department's proffered justifications for selecting Johnson. Again, the record does not support her position.  Even viewing all the evidence in the light most favorable to Dishman, no reasonable jury could conclude that Munson had the ultimate hiring authority for the IOC director.  Munson testified

10

denied he was told at the start of the hiring process that there would be two rounds of interviews.

Dishman argues that the Department's explanation that it added a second round of interviews to evaluate the candidates' communication skills is unworthy of credence because there is evidence that both Dishman and Johnson were perceived in the Department as having difficulty communicating effectively. But evidence of the candidates' past difficulties with effective communication does not contradict the Department's assertion that a second round of interviews was needed to evaluate their communication skills. Indeed, if both candidates were weak communicators, it follows that the Department would want to address communication skills in the interview to be sure that it selected the stronger candidate.

Dishman also argues that because the interviewers took few notes, the second round of interviews was a sham. But a reasonable jury could not conclude from the paucity of notes that the Department did not convene the second round of interviews to evaluate Dishman and Johnson based on questions that reflected the skills required for the director position.

_____

that he lacked that authority. And Kelly testified that either he or the Deputy Secretary had to approve the hiring decision. Dishman argues that because Kelly or the Deputy Secretary could have given electronic approval of a candidate selected by Munson, Munson actually had final decision making authority. But we fail to see how a reasonable jury could conclude from the fact that Kelly or the Deputy Secretary could give their final approval electronically that Munson was the ultimate decisionmaker.

11

Finally, Dishman argues that the Department's proffered justification for selecting Johnson was pretextual because the second interview panel relied on subjective, not objective, standards to select Johnson.  But we have previously held that employers may rely on subjective criteria when making employment decisions and recognized that subjective factors may weigh "heavily" in employment decisions for supervisory positions.  *Chapman*, 229 F.3d at 1033-34.  Accordingly, we conclude that Dishman failed to show pretext because no reasonable jury could conclude that the Department's proffered reasons for conducting a second round of interviews and selecting Johnson were unworthy of credence.

Even assuming that a reasonable jury could conclude that the Department's stated reasons were false, no rational factfinder could conclude that the Department's actions were discriminatory.  This is because Dishman, at best, has created a weak issue of fact as to whether the Department's proffered reasons were untrue and there is "abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 147.[4]

## IV.    Conclusion

Because the district court properly granted summary judgment to the Department, we affirm.

---

[4] Dishman also argues that the district court erred in granting summary because the Department failed to include any citations to the record in its summary judgment motion.  But Dishman failed to raise this issue in the district court, and we will not consider it for the first time on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

12

**AFFIRMED.**