[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12090
_____

D.C. Docket No. 3:10-cv-00871-WHA-WC

LEANNE RENEE KIDD,

Plaintiff-Appellant,

versus

MANDO AMERICAN CORPORATION,

Defendant-Appellee.
_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(September 27, 2013)

Before CARNES, Chief Judge, and WILSON, Circuit Judge, and HUCK,[*] District Judge.

---

[*] Honorable Paul C. Huck, Senior United States District Judge for the Southern District of Florida, sitting by designation.

HUCK, District Judge:

Appellant Leanne Renee Kidd, a white female, had her eyes on the assistant accounting manager position at Appellee Mando America Corporation, a Korean-owned auto-parts manufacturer. When the time came for Mando's management, composed entirely of Korean males, to select someone to fill the position, management gave the job to a Korean male named Byong Woo "B.W." Seo. Mando claims the relevant decisionmakers selected Seo over a number of other pre-screened candidates — not including Kidd — because he had superior qualifications, not because he was a Korean male.[1]

Kidd is not convinced. She contends that Mando's justification for hiring Seo is a pretext for its preference to fill managerial positions with Korean males. To support this assertion, Kidd relies on a remark made by one of Mando's human resource managers, Jerry Rolison. Kidd claims Rolison told her that Mando's management refused to consider American candidates for the assistant accounting manager position. From this statement — and other circumstantial evidence — Kidd contends a jury could reasonably find that Mando's hiring process was unlawfully discriminatory.

---

[1] Kidd, unaware that the position was open, did not apply for the assistant accounting manager position. Moreover, Kidd has pointed to nothing in the record, apart from the fact that she assumed some of Anderson's former duties, to suggest that anyone in Mando's management might have considered her a viable candidate for the job.

Kidd's ability to establish pretext hinges on the admissibility of Rolison's statement — an evidentiary question that neither the parties nor the district court has addressed. Out of deference to the well-established rule that we shouldn't pass judgment on issues the parties do not raise, we vacate the district court's grant of summary judgment, and allow it the opportunity to consider the admissibility of Rolison's statement. In our view, the resolution of this evidentiary question is in turn critical for the resolution of this case.

## I.    Background

This case arises out of a rocky employment relationship between Kidd and Mando. Kidd joined Mando's accounting department in January 2008 as the accountant in charge of accounts payable and the general ledger. Only a few months later, the assistant accounting manager (who was also Kidd's immediate supervisor), Tim Anderson, was terminated for performance reasons. When that happened, Kidd assumed added responsibilities; she became responsible for "anything that had to do with accounts payable," and, in her view, "absorbed Mr. Anderson's position." Despite Kidd's increased role, Mando did not appoint her — or anyone else — interim assistant accounting manager. Indeed, Mando left the position vacant for some time.[2]

---

[2]  Mando asserts that it didn't move quickly to find another assistant accounting manager because of the economic downturn and Mando's other pressing needs.

While Kidd's responsibilities increased, her pay did not.  Nor did Kidd receive a more senior title.  Disappointed, Kidd attempted to tender her resignation after only six months on the job.  When B.J. Cheong, Mando's accounting manager, became aware of Kidd's disappointment, he tried to persuade her to stay.  Cheong expressed his appreciation to Kidd that she had taken on added responsibility, but informed her that Mando did not promote employees until they had been at the company for at least a year.  Cheong did, however, promise Kidd that if she gave him "six more months [ ] we will get you promoted."  Apparently, Cheong and Kidd did not discuss a specific promotion.

Around the spring of 2009, Tae Kwak, Mando's president, asked Rolison, Mando's human resource manager, to gather resumes of prospective candidates for the assistant accounting manager job.  Rolison did just that, utilizing the services of professional recruiters.  Rolison forwarded the resumes submitted by the recruiters to Kwak.  Kwak then selected a number of candidates he thought merited a closer review, and directed Scott Wren, another member of Mando's human resources department ("HR"), to telephonically interview those individuals.  No one at Mando encouraged Kidd to apply nor did anyone identify her as a potential candidate.

Without interviewing any other candidates, Mando hired a Korean male, B.W. Seo.  Seo was not among the candidates pre-screened by Wren.  Seo instead

4

came highly recommended by one of Mando's outside auditors. At the time, Seo was working for Sun Microsystems in Australia as an auditor.[3]

When word of Seo's hire spread, Kidd was none too pleased, having not been aware that Mando was actively seeking Anderson's replacement. Searching for answers, Kidd paid a visit to Rolison. Kidd claims that Rolison told her that he had shown Cheong and Kwak four separate resumes from qualified American candidates, but that "they refused to look at them for the position," and that "they refused to even consider an American candidate," Kidd Dep. 145:19-22; see id. at 346:7-12 ("Jerry Rolison told me himself that he had tried to get four Americans to be considered in the position [sic] and he was denied, they were not even allowed to interview").[4]

Seo and Kidd's relationship was troubled from the start. At an initial meeting between the two, Kidd suggested that the accounting department change the way it allocated costs. This prompted Seo to ask Kidd for her resume — a request Kidd found disparaging. Upset, Kidd complained to HR. While Kidd claims her visit was met with a verbal reprimand from Seo — during which he told

---

[3] Kwak claimed that in screening candidates for assistant accounting manager, Mando's management sought an individual with "a broad base of accounting experience, including Accounts Payable, Accounts Receivable, Treasury, and extensive auditing experience."

[4] On some other day, Kidd claims she was told by one of Mando's company trainers (who also had some involvement with HR), Deborah Stone, that no American would ever be involved in management, and that "it would always be Korean management."

her that she had "no right to go to HR" and that she "did not need to contact anyone other than him if [she] had problems with him," — a review of the record makes clear that Seo may not even have been aware of Kidd's complaint.[5]

After Seo's arrival, Kidd began losing the supervisory responsibilities she had assumed after Anderson's departure, though she suffered neither a decrease in pay nor a loss of title. Nevertheless, Kidd tendered her resignation on September 2, 2010. She credits her resignation to work conditions she viewed as unbearable.

Upset at the way she was being treated at Mando, Kidd filed two EEOC charges — one before she resigned, and one after. In her first EEOC charge, Kidd complained that she had not received the promotion she was promised because she was told that she "was not doing a good job because [she] could not work 80 to 100 hours per week like everyone else in the department." She also complained that Seo was "very demeaning and insulting to all of the women in [her] department." In light of this, and the absence of any female managers in Mando's 450-person company, Kidd alleged that Mando discriminated against her.

In Kidd's second EEOC charge, filed after her resignation, Kidd alleged that after filing her first EEOC charge, Seo removed all her responsibilities and that Seo verbally harassed and disparaged Kidd in meetings and other correspondence.

---

[5] Kidd conceded in her deposition that the conversation in which Seo purportedly told her that she had no right to go to HR came in the form of an email, not during an in-person conversation. But a review of this email makes clear that Seo never criticized Kidd for complaining to HR; he simply reviewed their initial meeting.

Seo's reprisals allegedly became increasingly aggressive and hurtful with each of Kidd's successive complaints to HR.  Because of all this, Kidd alleged that she was constructively discharged and forced from her job, and thus the subject of unlawful retaliation.

Kidd filed a complaint in the United States District Court for the Middle District of Alabama, alleging gender discrimination, racial discrimination, and national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq.  She also advanced hostile work environment and unlawful retaliation claims, in addition to a number of state law claims.  The basis of Kidd's employment discrimination claim was that Mando discriminated against her on account of her gender and national origin in failing to promote her to assistant accounting manager.  The district court granted Mando's Motion for Summary Judgment as to Kidd's discrimination and retaliation claims, and declined to exercise supplemental jurisdiction over her state law claims.[6]  Kidd abandoned her hostile work environment claim before the lower court addressed Mando's motion.

## II.    Discussion

Before us, Kidd challenges the district court's grant of summary judgment in Mando's favor.  She contends principally that the district court erred in: (1) failing to consider her unlawful demotion claim on the merits; (2) finding that she had not

---

[6]  The state law claims Kidd advanced included: negligent hiring, training, supervision, and retention and intentional infliction of emotional distress.

made out a prima facie case on either her discrimination or retaliation claims; and (3) holding in the alternative that Kidd did not create a material factual dispute as to whether the reason Mando offered for choosing Seo over her was pretextual. We review the district court's grant of summary judgment de novo viewing the facts and drawing all reasonable inferences in favor of Kidd.

**A. The Discrimination Claim**

Title VII prohibits employers from discriminating against their employees on the basis of their gender or national origin. 42 U.S.C. § 2000e-2(a). Kidd contends that Mando violated this prohibition in selecting Seo over her solely because he was a Korean male. McDonnell Douglas Corp. v. Green provides the familiar three-part framework under which we review a claim for employment discrimination that, as here, is based on circumstantial evidence, as opposed to direct evidence. 411 U.S. 792 (1973).

The Title VII plaintiff bears "the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Thus, under the first part of McDonnell Douglas, the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination. If she does, the burden of production shifts to the employer, which requires the employer to introduce evidence of "some legitimate, nondiscriminatory reason" for its employment decision. McDonnell Douglas, 411

8

U.S. at 802.  If the employer satisfies its burden, "the presumption raised by the prima facie case is rebutted."  Collado v. United Parcel Serv. Co., 419 F.3d 1143, 1151 (11th Cir. 2005) (internal quotation marks omitted).  Because the burden of persuasion remains with the employee, she must then show that the seemingly legitimate reason the employer gave was pretextual — i.e., the "proffered reason was not the true reason for the employment decision."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993) (internal quotation marks omitted); see also Collado, 419 F.3d at 1150 (noting that once the employer satisfies its burden "the presumption of discrimination that arose when the plaintiff made [her] prima facie showing 'drops from the case,' and 'the case is placed back into the traditional framework — in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against [her] on the basis of a protected personal characteristic'" (internal citations omitted)).

Kidd grounds her employment discrimination claim on two related, but distinct, theories: first, that she was unlawfully demoted; and second, that Mando unlawfully failed to promote her.

**1.  Kidd's Unlawful Demotion Claim**

Kidd contends the district court erred in rejecting Kidd's unlawful demotion claim because she raised it for the first time in her Response to Mando's Motion

9

for Summary Judgment. We need not consider Kidd's argument, however, because we find that her claim fails on the merits.

To establish a prima facie case of discrimination under Title VII the plaintiff must show that she was "subjected to an adverse employment action." Ferrill v. Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999). An adverse employment action is "a serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted). In the context of an unlawful demotion claim, the plaintiff must show she was assigned "significantly different responsibilities" or her employer made a decision that "caus[ed] a significant change in benefits." Webb-Edwards v. Orange Cnty. Sheriff's Office, 525 F.3d 1013, 1031 (11th Cir. 2008) (internal quotation marks omitted).

Because Kidd suffered neither a decrease in pay nor a loss of title — but only a loss of supervisory responsibilities — she needs to show that her case is one of those "unusual instances" where the change in responsibilities was "so substantial and material that it [] indeed alter[ed] the 'terms, conditions, or privileges' of [her] employment." Davis, 245 F.3d at 1245.

This Kidd has not done. When Anderson was terminated, Cheong appointed Kidd to temporarily manage the accounts payable department, but not the accounts receivable department (which went to another employee). Practically speaking,

this meant Kidd supervised the two accounts payable clerks and approved invoices and handled wire payments. At no point, however, did Kidd hold herself out as the assistant accounting manager, express interest in the position, or assume supervisory responsibilities over the accounts receivable clerks. Nor did anyone in the accounting department ever refer to her as the assistant accounting manager.[7] Still, Kidd was of the view that she "absorbed Mr. Anderson's position."[8]

When Seo became the assistant accounting manager Kidd slowly began to lose the supervisory responsibilities she assumed when Tim Anderson was terminated. Those responsibilities went to Seo, and Kidd's responsibilities reverted to those she had before Tim Anderson's departure.[9]

Because Kidd's demotion claim is grounded on a loss of supervisory responsibility, it is one our circuit does not favor. "Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." Davis, 245 F.3d at 1244. And it is by now

---

[7] Kidd represents that "[o]ther employees in the Accounting and Purchasing Department at Mando assumed that Kidd assisted in managing the Accounting Department." A review of the record shows that Kidd may have been overreaching here. As she testified, it was only one of Mando's engineers who thought that she was the accounting manager.

[8] Kidd was not unique in this respect. After Anderson's termination several accounting department employees assumed greater responsibility than they had before his termination.

[9] See Kidd Dep. 314:21-315:1
    Q: Okay. So instead of having you do a certain job that you used to do, BW [Seo] started doing the job?
    A: Yes.

11

axiomatic that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions," id. at 1245 (internal quotation marks omitted) (citing Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).  Yet this is precisely the role Kidd asks us to assume.

Regardless of whether in Kidd's view her reduced load had "a tangible adverse effect on [her] employment," an "employee's subjective view of the significance and adversity of the employer's action is not controlling."  Id. at 1239.  The touchstone is instead whether the allegedly adverse employment action was "materially adverse as viewed by a reasonable person in the circumstances."  Id.  Kidd's demotion claim — grounded on a loss of supervisory responsibility of the accounts payable department, not a loss of salary or benefits — does not rise to that level.  Nor is it "unusual."  See id. at 1244 (holding that "some blow to [a plaintiff's] professional image . . . is simply not enough to prevail").[10]

Thus, regardless whether the district court erred in failing to consider Kidd's unlawful demotion theory on the merits, her claim still fails because the evidence she offers in support of her contention that she suffered an adverse employment action is insufficient to make out a prima facie case.[11]

---

[10]  It appears that Kidd was bothered less by the loss of supervisory responsibilities than the way in which the responsibilities were taken away.  Kidd testified: "I don't think the frustration came in not having those job duties, it's the way it [was] handled and how [Seo] took them away from me."  Cf. Davis, 245 F.3d at 1242 ("the protections of Title VII simply do not extend to everything makes an employee unhappy").

## 2. Kidd's Failure to Promote Claim

To make out a prima facie case in a failure to promote case, the plaintiff needs to show, among other things, that she "applied for and was qualified for a promotion." Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010). The district court found that Kidd met the first part of this requirement, but failed to offer evidence that she was objectively qualified. The district court relied on Mando's representation that it sought someone with auditing experience — experience Kidd indisputably didn't have. But in doing so the district court apparently did not consider that Mando had not objectively defined or publicized its required qualifications.

Our circuit precedent considers an employee qualified for a promotion if the employee offers evidence that "she satisfied an employer's objective qualifications." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005) (per curiam). But where the qualifications for the job are neither "objectively verifiable" nor "easily obtainable or within the plaintiff's possession,"

---

[11] The same is not true of Kidd's failure to promote claim. We've made clear that while it's a rare case where a change in employment responsibilities qualifies as an adverse employment action, the same is not true of a Title VII claim grounded on an employer's failure to promote the Title VII plaintiff. See Webb-Edwards, 525 F.3d at 1031 ("The Supreme Court has defined an adverse employment action as follows: 'A tangible employment action constitutes significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.'") (emphasis added; citation omitted).

13

id. (emphasis omitted), the plaintiff need not satisfy this portion of the prima facie case.

That was true here. As Kwak's testimony makes clear, Mando never formally posted or publicized its desire to hire an assistant accounting manager with auditing experience. Only during internal discussions did management express the need to hire an "individual with . . . extensive auditing experience." See Kwak Dep. 146:15-23-147:1-5 ("I thought since – since we've had a lot of . . . financial audit issues, I think that was good that somebody from our auditing firm was recommending [Seo]."). In light of this, Mando's hiring criteria was neither objectively verifiable nor easily within Kidd's possession. Thus, to make out a prima facie case Kidd did not need to present evidence that she possessed auditing experience.[12]

Once the employee makes out a prima facie case the burden shifts to the employer to articulate a non-discriminatory reason for the adverse employment decision. Because the employer's burden is one of production — not persuasion

---

[12] Mando seems to suggest that Kidd needed to have applied for the assistant accounting manager position in order to make out a prima facie case. Not so on these facts. In Jones v. Firestone Tire & Rubber Co., 977 F.2d 527, 533 (11th Cir. 1992), we reiterated that when an employer does not formally announce that it is seeking to hire for a vacant position within the company, the plaintiff need not advance evidence that she applied for the vacant position to state a prima facie case. Under these circumstances, an employer "has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." Id. (quoting Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133-34 (11th Cir. 1984)). Because Kidd had expressed interest in a promotion, Mando could have reasonably expected that Kidd had an interest in the assistant accounting manager position — the position immediately above the one she occupied.

14

— the employer "need not persuade the court that it was <u>actually</u> motivated by the proffered reason[]." <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1024 (11th Cir. 2009) (en banc) (emphasis added) (citation & internal quotation marks omitted). Rather, the employer's reason need only be specific enough so that the "plaintiff [is] afforded a full and fair opportunity to demonstrate pretext." <u>Id.</u> at 1034 (internal quotation marks omitted). If the employer carries its burden, the burden shifts back to the plaintiff to introduce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." <u>Id.</u> at 1024 (internal quotation marks omitted).

Mando contends that it hired Seo because he had auditing experience — experience Mando's accounting department needed and experience the pre-screened candidates and Kidd did not have.[13] Because Mando's reason for hiring Seo is objectively reasonable on its face — and specific enough for Kidd to rebut — the burden shifts back to Kidd "to come forward with sufficient evidence to permit a reasonable factfinder to find" that Mando's reason for choosing Seo over

---

[13] This case does not perfectly fit the traditional framework of Title VII failure to promote cases because here Kidd neither applied for the assistant accounting manager position nor did any recruiter suggest Kidd for the position. Indeed, as it seems readily apparent that aside from Kidd herself, no one within Mando or the recruiters even considered Kidd as a viable candidate.

15

her — i.e., he was more qualified, including having auditing experience — was pretextual. Chapman, 229 F.3d at 1028.[14]

To show pretext, the employee must confront the employer's seemingly legitimate reason for not promoting her "head on and rebut it." Chapman, 229 F.3d at 1030 (citing Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th Cir. 2000)). The plaintiff "cannot succeed by simply quarreling with the wisdom of that reason." Id. Indeed, "a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the person who received the position [s]he coveted." Springer v. Convergys Customer Mgmt. Grp., 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam) (internal brackets & quotation marks omitted). The plaintiff "must show that the disparities between the successful

---

[14] Kidd contends that the district court erred in crediting Mando's proffered reason for hiring Seo over other candidates. Specifically, Kidd contends that the district court violated the teachings of Reeves v. Sanderson Plumbing Products, Inc., which said that, for purposes of summary judgment, the district court can't credit evidence favoring the moving party unless that evidence is "uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 530 U.S. 133, 151 (2000) (internal quotation marks omitted). This is incorrect. Kidd's argument ignores the fact that the employer's burden is not one of persuasion but a burden of production, which itself "can involve no credibility assessment," id. at 142 ( internal quotation marks omitted). Indeed, if we were to accept Kidd's argument that a district court can never credit an employer's witnesses for purposes of the second stage of the McDonnell Douglas analysis, then we'd be categorically barred from considering an employer's legitimate, non-discriminatory reason for hiring one individual over another. See, e.g., Everett v. Cook Cnty., 655 F.3d 723, 729 n.2 (7th Cir. 2011) ("Even if testimony comes from interested employees, [w]e do not interpret [Reeves] so broadly as to require a court to ignore the uncontroverted testimony of company employees or to conclude, where a proffered reason is established through such testimony, that it is necessarily pretextual." (first alteration in original) (internal quotation marks omitted)). This is certainly not what the Court intended by the passage in Reeves that Kidd relies on.

16

applicant's and [her] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Id. (internal quotation marks omitted).

Because Kidd's primary argument is that she was more qualified than Seo she encounters these well-established principles. To support her claim that she was indisputably more qualified than Seo, Kidd offers a number of reasons why this was the case. The reasons Kidd relies on are: (1) Kidd had more managerial experience than Seo; (2) while Seo has auditing experience, he does not have as broad a background in accounting as Kidd, since, in her view, she served as the de facto assistant accounting manager for a year-and-a-half; (3) both had similar job histories; (4) Rolison allegedly believed that Seo wasn't qualified for the job; (5) Kidd was an internal candidate and known quantity, unlike Seo; (6) Seo allegedly misrepresented some facts on his resume, which, in Kidd's view, made him ineligible for employment at Mando; (7) Kidd's educational background was stronger since she had a bachelor's degree in accounting and management, while Seo merely had a degree in accounting; and (8) Seo started, but did not finish, an MBA degree, while Kidd was working on a Masters in Public Accounting degree in 2009, and completed the program in 2010.

Kidd's argument about her qualifications relative to Seo's is one we cannot accept. Our well-established circuit precedent prohibits us from deciding whom as

17

between two candidates an employer should have hired. Our task is simply to review the qualifications of the selected candidate and plaintiff, and determine whether the difference between the two is of "such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Springer, 509 F.3d at 1349 (internal quotation marks omitted).

Despite Kidd's laundry list of reasons of why, in her mind, she would have been a more qualified assistant accounting manager, we do not find that Kidd's educational experience, job history, or supervisory experience, made her exceptionally more qualified than Seo, much less his equal. As we've repeatedly stressed, in enacting Title VII Congress did not intend to transform federal courts into a "super-personnel department that reexamines an entity's business decisions." Chapman, 229 F.3d at 1030 (citation & internal quotation marks omitted). Our job is instead to determine "whether the employer gave an honest explanation" to justify its hiring decisions. Id. If the employer gives one, we're not in a position to "second-guess [its] business judgment," id. Because Kidd's argument regarding why she was more qualified than Seo calls into question Mando's business judgment — not its honesty — it is one we must reject.

Kidd's secondary argument is that putting aside the disparity between her and Seo's relative qualifications, there is sufficient circumstantial evidence to show

18

that the reason Mando gave for choosing Seo over her was pretext for discriminatory animus.  Smith v. Lockheed-Martin Corp. makes clear that "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  644 F.3d 1321, 1328 (11th Cir. 2011).

The potentially strongest circumstantial evidence for Kidd is her testimony that Rolison informed her that Kwak and Cheong "refused to even consider an American candidate" for the assistant accounting manager job.  See Kidd Dep. 346:7-12 ("Jerry Rolison told me himself that he had tried to get four Americans to be considered in the position [sic] and he was denied, they were not even allowed to interview").  Kidd also testified that another member of HR (Deborah Stone) told her that "no matter what . . . there would never be any American management in the company, it would always be Korean management . . . ."  Kidd contends that from these statements a jury can reasonably infer that the reason Mando gave for hiring Seo (he was more qualified) was pretextual, and that the relevant decisionmakers harbored a "discriminatory attitude."

The problem with Kidd's argument, as we view it, lies not in her analysis of the contents of these alleged statements — Rolison's, in particular — but in her failure to identify an evidentiary basis under which they are admissible in light of the well-established rule that at the summary judgment stage, we "may consider

19

only that evidence which can be reduced to an admissible form." Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005).

As a starting point, we note that Rolison's statement regarding Mando's hiring process — i.e., that the decisionmakers "refused to even consider an American candidate"— is subject to two, distinct interpretations. One interpretation is that Rolison's statement is one of opinion which concerned a matter within the scope of his employment, as contemplated by Federal Rule of Evidence 801(d)(2)(D). Rule 801(d)(2)(D) provides that a statement is not hearsay if the "statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Thus, if Kidd were able to show by "a preponderance of the evidence that [Rolison] was speaking as an agent of [Mando] at the time he made [this] statement[]," it would be admissible. Rowell, 433 F.3d at 800. A second interpretation of Rolison's alleged remark is that Rolison was simply repeating what the Mando decisionmakers told him or what he heard them say. If that was the case, then Rolison's remark might be admissible as an admission by a party opponent absent a valid hearsay

20

objection.[15]  If neither is true, however, Rolison's alleged remark would be inadmissible hearsay.[16]

So far so good, except we face two hurdles that hinder our review of this evidentiary issue.  The first is that the issue hasn't been raised by the parties or the district court.  And as we have cautioned: "Issues should not sprout like weeds in appellate opinions no matter how fertile the minds of the judges deciding the appeal."  Norelus v. Denny's Inc., 628 F.3d 1270, 1297 (11th Cir. 2010); see also, e.g., Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("If an argument is not fully briefed (let alone not presented at all) to the Circuit Court, evaluating its merits would be improper both because the appellants may control the issues they raise on appeal, and because the appellee would have no opportunity to respond to it.").  This is especially true where, as here, the resolution of the evidentiary question is, in our view, outcome determinative: if Rolison's statement is admissible, Kidd will have successfully created a dispute of

---

[15]  To be sure, we do not suggest that if Kidd were able to prove that this statement was based on an observation Rolison made or something he was told by the Mando decisionmakers that it would automatically be admissible as an admission by a party opponent.  Kidd would still have to identify an additional exception to the rule against hearsay because it is Rolison's — rather than the Mando decisionmakers' — statement itself that has to be admissible.  This may prove difficult in light of Rolison's testimony that "at no time did [he] tell Leanna Kidd that Mr. Kwak or any other member of management refused to consider the resumes of American candidates."

[16]  Without citing to any particular rule of evidence, the district court dismissed Rolison's statement as "irrelevant" because he was not a decisionmaker and "thus had no hand in the final decision as to whom to hire."  As we will explain, however, a statement made by a non-decisionmaker may be both relevant and attributable to the defendant employer if the non-decisionmaker was sufficiently involved in the decisionmaking process leading up to the adverse employment action.

material fact regarding the legitimacy of Mando's explanation for hiring Seo over her; if it is not admissible, by contrast, Kidd will not have created a dispute of material fact.

The second hurdle is that because the facts surrounding Rolison's alleged remark are unclear we cannot determine its admissibility as a matter of law.  If Kidd seeks to introduce Rolison's alleged remark under Rule 801(d)(2)(D), she needs to show that Rolison participated — at least to some extent — in Mando's decision to hire Seo and not promote Kidd.  See Rowell, 433 F.3d at 800 (observing that "courts have admitted statements of managers under Rule 801(d)(2)(D) where there is some evidence that the statements reflected some kind of participation in the employment decision or policy of the employer"); see also Simple v. Walgreen Co., 511 F.3d 668, 672 (7th Cir. 2007) (Posner, J.) (holding that statement by non-decisionmaker was admissible under Rule 801(d)(2)(D) because "she was involved in the process that led up to [the adverse employment action]").  As we explain, however, Rolison's level of involvement in the decisionmaking process is far from clear.

On the one hand, it appears that Rolison was only tangentially involved in Mando's decision to hire Seo, and that the Mando decisionmakers didn't consult with Rolison regarding Seo's hire over other eligible candidates.  Indeed, as Kidd's counsel readily acknowledged at oral argument, Rolison's view that the Mando

22

decisionmakers refused to consider an American candidate was based on "his perception, his belief," Oral Arg. 7:10-7:37, rather than "something that [he] had been told by upper management," Rowell, 433 F.3d at 801 (emphasis in original) (internal quotation marks omitted).  But on the other hand, Rolison was the head of Mando's human resources department, which may suggest "he [was] authorized to speak with subordinates about [] [Mando's] employment practices . . . ."  Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 298-99 (3d Cir. 2007) (expressing the view that a non-decisionmaker's lack of participation in an adverse employment decision does not "render his opinion regarding company policy beyond the purview of Rule 801(d)(2)(D)") (internal quotation marks omitted).

In Rowell v. BellSouth, we shed some light on the contours of Rule 801(d)(2)(D), which may be illuminating here.  Rowell involved a workforce reduction that the plaintiff claimed discriminated against him on the basis of age. To support his claim, the plaintiff sought to introduce testimony from one of his co-workers who testified that his supervisor — a non-decisionmaker — informed him that performance evaluations used to reduce the workforce favored youth, and that a lot of the termination decisions were  based on the company's desire "to keep the youth."  Id. at 800.  We held that this testimony was inadmissible under Rule 801(d)(2)(D) because the statements the plaintiff sought to introduce were "in reality nothing but the inadmissible opinion of" a non-decisionmaker, Rowell, 433

23

F.3d at 800, rather than something the non-decisionmaker "had been told by upper management about the role age was to play" in the workforce reduction, id. at 801.

We take this opportunity to make clear that Rowell did not hold, as the district court seemed to suggest, that a non-decisionmaker can never be considered an agent under Rule 801(d)(2)(D). Rowell says only that to be considered an agent for purposes of Rule 801(d)(2)(D), the record needs to reflect "some kind of participation in the employment decision or policy of the employer." Id. at 800. Yates v. Rexton, Inc., 267 F.3d 793 (8th Cir. 2001), and Woodman v. Haemonetics Corp., 51 F.3d 1087 (1st Cir. 1995) — two cases we relied on in Rowell — are also instructive.

In Yates, the plaintiff alleged that the workforce reduction under which he was terminated discriminated against him on the basis of his age. To support his claim, the plaintiff sought to introduce statements by a managing director and manager of the parent company of his employer, "expressing their . . . view that workers should retire after age 60." Yates, 267 F.3d at 801. In addressing whether these executives' statements were admissible the Eighth Circuit maintained that although the individuals who made the seemingly discriminatory remarks did not directly call for the plaintiff's termination, "they were intimately involved in the process of shaping [the] [ ] workforce," id. at 802 (emphasis added), and thus, could be considered "agents" under Rule 801(d)(2)(D). See also id. (observing

24

that "[s]ignificant involvement, either as advisor or other participant in a process leading to a challenged decision, may be sufficient to establish agency under Rule 801(d)(2)(D)") (internal quotation marks omitted).

The plaintiff in Woodman similarly alleged that his employer had discriminated against him on the basis of age in terminating him in connection with a workforce reduction. To rebut the employer's performance-based reason for terminating him, the plaintiff offered evidence that his supervisor had relayed to him conversations she had with management regarding future terminations. Woodman, 51 F.3d at 1090. During one of those conversations the plaintiff testified that his supervisor said of management: "These damn people—they want younger people here. They will be the ones that will be successful here." Id. The supervisor's remark came on the heels of a meeting she attended with management and immediately before the workforce reduction plan was put into place by management. Id. at 1094. As in Yates, the First Circuit considered whether the supervisor's remark was admissible under Rule 801(d)(2)(D). And as in Yates, the panel found that the supervisor's remark was admissible despite her lack of decisionmaking authority because she was directly involved in "assessing the performance of . . . employees under her supervision (including [the plaintiff])" and even "recommend[ed] that [the plaintiff] be relieved from his duties." Id.

25

In this case, it remains unclear whether Rolison's role in the decisionmaking process was a narrow one — involving only the gathering of resumes submitted by professional recruiting services for management to review — or whether it amounted to something more.  If the former is true — and Rolison's role was largely ministerial — Rowell suggests that Rolison was not acting as Mando's agent when he made the remarks Kidd attributes to him regarding his personal opinion of Mando's selection process.  If, however, Rolison was consulted by Mando's management (or otherwise included in the decisionmaking process) that may be enough to make his statement an admission by Mando.  See, e.g., Simple, 511 F.3d at 672 (noting that when a non-decisionmaker is consulted about an employment decision, a later statement by that non-decisionmaker expressing his view of the employment decision is admissible under Rule 801(d)(2)(D)).[17]

The same record deficiencies exist with respect to the second basis under which Rolison's alleged statement may be admissible.  It is entirely unclear whether Rolison's alleged statement that the Mando decisionmakers "refused to even consider an American candidate," was based on something he observed or heard, or whether it was his own personal opinion.  As mentioned above, Kidd's

---

[17]  We do not suggest that the statement Kidd attributes to Deborah Stone regarding the possibility of an American occupying a managerial position is admissible under Rule 801(d)(2)(D).  Because Kidd has not put forth any evidence regarding Stone's involvement in the hiring process, her testimony appears to be, as in Rowell, based on personal opinion, and is not admissible under Rule 801(d)(2)(D).

26

counsel indicated it was the latter — that Rolison's alleged statement was based on "his perception, his belief." Nevertheless, because the nature of Rolison's vague statement presents a factual — rather than legal — question, its meaning creates a factual dispute that should have — but was not — fully explored below.

In sum, we find that while Kidd has made out a prima facie case of employment discrimination, it remains unclear whether she created a dispute of material fact regarding whether the reason Mando offered for hiring Seo was a pretext for discriminatory animus. The answer to this question hinges on the admissibility of Rolison's alleged remark regarding the nature of Mando's hiring process. If the district court determines that Rolison's statement is admissible, then there is sufficient evidence to raise a factual dispute about the legitimacy of Mando's proffered reason for hiring Seo. But if, on the other hand, the district court determines that Rolison's statement is not admissible, then there is no factual dispute and summary judgment is appropriate. Because the meaning of Rolison's statement is subject to different interpretations and the scope of Rolison's involvement in the decisionmaking process leading up Seo's hire is unclear, we think the prudent course is to remand this case to the district court so that it may determine whether Rolison's alleged statement is admissible.[18]

---

[18] Kidd brings to our attention other circumstantial evidence from which she contends that a reasonable jury can infer that Mando's hiring decision was motivated by discriminatory animus. But none of this evidence takes Kidd the distance she needs to travel — when viewed in isolation

27

**B.    The Retaliation Claim**

Title VII prohibits not only discrimination, but retaliation against an employee because she "has opposed any practice made an unlawful employment practice by Title VII," Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (internal brackets omitted) (quoting 42 U.S.C. § 2000e-3(a)).  To make out a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in an activity protected under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action.  Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012) (citations omitted).  The district court found that Kidd didn't make out a prima facie case because she didn't produce sufficient evidence to show that there was a causal connection between Kidd's protected activity (i.e., complaining about workplace discrimination) and the adverse action Kidd alleges she suffered.

We agree.  To establish a causal connection, a plaintiff must show that the relevant decisionmaker was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated."  Shannon v. Bellsouth

---

or even together.  First, the fact that Mando did not publicize its hiring process does not suggest Mando acted with discriminatory intent.  Indeed, "even where preselection violates corporate personnel policies, it does not necessarily indicate" that the employer based a promotion decision on impermissible characteristics.  Springer, 509 F.3d at 1350.  Second, the fact that Mando may have violated federal immigration laws, see 8 U.S.C. § 1182, when it hired Seo before demonstrating that it unsuccessfully tried to fill the assistant accounting manager position with an American candidate, is also not evidence from which a jury may infer that Mando harbored discriminatory animus.

Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (internal quotation marks omitted).  While Kidd makes the blanket assertion that after each of her protected complaints Seo retaliated against her, she fails to tie any of her complaints to retaliatory conduct.  The closest she comes to doing so is her assertion that she lost supervisory responsibilities after an October 2009 meeting with HR to discuss her initial interactions with Seo.  But, as we will discuss, even if a loss of supervisory responsibilities qualifies as an adverse action — a question we need not explore — Kidd fails to show that the loss of supervisory responsibilities was causally connected to her October 2009 meeting.

The basis for Kidd's October 2009 visit with HR was Seo's request to review her resume — a request Kidd found demeaning.  When she left the meeting during which Seo requested her resume, Kidd went straight to HR to discuss what had happened.  Kidd testified that after her visit to HR, Seo told her, via email, that "he was embarrassed by [Kidd] going to HR because [she] went over his head and he was ashamed of how [she] treated him."  However, a review of this email makes readily apparent that Seo made no mention of her visit to HR.  Nor can one reasonably infer from his email that he was even aware of her visit to HR.  Quite the contrary.  It appears that what prompted Seo's email to Kidd was not her visit to HR, but the fact that Seo was CC'd on Kidd's email to the folks at HR, asking them to forward her resume to Seo.

29

Thus, even if we assume that a loss of supervisory responsibilities may qualify as an adverse action, Kidd's retaliation claim still fails on the merits. This is because, as the district court correctly observed, Kidd has not offered any evidence to show that Seo was aware of any of her protected complaints, making it impossible for her to make out a prima facie case.

———————————

In sum, we vacate the district court's grant of summary judgment in favor of Mando regarding Kidd's employment discrimination claim, but affirm it in all other respects. The district court is instructed to determine whether Kidd's testimony about Rolison's alleged statements is admissible and, if it is, to reconsider Mando's Motion for Summary Judgment in light of that determination.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**

WILSON, Circuit Judge, concurring in part and dissenting in part:

The majority returns this case to the district court so that it may determine whether Kidd's statement about what Rolison told her is admissible as an exception to the hearsay rule. See Majority Op. at 27. Respectfully, I dissent.[1] The majority instructs the district court to determine whether Rolison's comment was his own personal opinion or something he heard directly from the Mando decision makers. See id. But at oral argument, Kidd's counsel, who deposed Rolison, conceded that Rolison's comment was "his own perception." It seems unnecessary, then, to return this case back to the district court to determine whether Rolison's comment was based on his own opinion or on information received from the Mando decision makers. Doing so provides Kidd with a second opportunity to survive summary judgment, an opportunity the typical Title VII plaintiff does not enjoy. Kidd said it was Rolison's own perception that Mando was not going to hire any Americans for the assistant accounting manager job. We should leave it at that, which is what the district court did the first time around.

Moreover, it was incumbent on Kidd's counsel to present a hearsay exception argument if there was a legitimate basis for it. The reason Rolison's "vague statement" was not "fully explored below" is because Kidd never made a hearsay exception argument to the district court. See id. Nor was any such

---

[1] I concur in the remainder of the opinion, affirming the decision by the district court.

31

argument made in the briefs on this appeal.  It is not this court's job to craft arguments for counsel.

I would affirm the summary judgment entered by the district court.  Kidd says Rolison told her that no Americans were considered for the job.  Rolison denies this, but we must accept Kidd's version of the events.  The district court then found that Rolison was not a decision maker and that he had "no hand in the final decision as to whom to hire" for the assistant accounting manager position.  Kidd also conceded this fact at oral argument and admitted that Rolison's only role in Mando's employment decision was to gather resumes and forward them to his supervisors.  In other words, there is no factual dispute about Rolison's role.  Assuming the statement was made and, arguendo, it is admissible, Kidd's claim still fails based on our precedent.  Rolison's "vague statement" is not nearly enough to create a material issue of fact on pretext.  See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1268 (11th Cir. 2010) (Carnes, J.) (holding comment made by non-decision maker "too weak to raise a genuine fact issue"); see also Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1455–57 (11th Cir. 1997) (per curiam) (comments by low-level supervisors repeating management's discriminatory comments are inadmissible hearsay).  Consequently, I would affirm the district court's grant of summary judgment.