[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11340
_____

D.C. Docket No. 3:10-cv-01170-MMH-TEM

RUDOLPH DAVIS, SR.,

Plaintiff-Appellant,

versus

CITY OF LAKE CITY, FLORIDA,

Defendant-Appellee.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 23, 2014)

Before MARTIN and ANDERSON, Circuit Judges, and HUCK,[*] District Judge.

_____

[*] Honorable Paul C. Huck, Senior United States District Judge for the Southern District of Florida, sitting by designation.

HUCK, District Judge:

Appellant Rudolph Davis is an African American who worked for Appellee, the City of Lake City ("the City"), as a police officer from 1990 until his termination on November 16, 2009.  Although Davis initially brought both discrimination and retaliation claims, the scope of this case was significantly narrowed at oral argument before this Court.  The only remaining claim for us to consider is Davis's retaliation claim based on his termination in violation of Title VII, 42 U.S.C. § 2000e.[1]  In that regard, the sole contested issue is whether the City's proffered non-retaliatory reason for Davis's termination was pretextual.  The district court granted summary judgment for the City.  We review the district court's decision de novo and, for the reasons stated below, affirm.

## I.    FACTS AND PROCEDURAL HISTORY

The facts of this case are set out in great detail in the district court's opinion.  For purposes of this appeal, we summarize only the facts relevant to Davis's remaining retaliation claim.[2]

Davis began as an officer with the Lake City Police Department (the "Department") in 1990 and rose through the ranks.  By the time of his termination,

---

[1]    This narrowing may be of small consolation to the district judge who was compelled by Davis's broad and ambiguous filings to address multiple and extensive claims of discrimination and retaliation related to conduct as far back as 1996.

[2]    At oral argument, Davis agreed that we need to consider only those facts that occurred after his first-filed grievance in 2007.  Davis also agreed that he was only pursuing his retaliation claim based on his termination; therefore, we need not consider facts related to other allegedly retaliatory acts Davis previously asserted.

he was a captain, second-in-command.  Davis earned many accolades during his tenure with the Department, including being named both Supervisor of the Year and Hardest Working Employee multiple times.  The month before he was fired, Davis received his best annual evaluation in over 19 years of service.  That evaluation, signed by the newly appointed police chief who ultimately terminated him, Argatha Gilmore, showed Davis exceeding expectations in every category evaluated.[3]  Gilmore, also African American, told a newspaper that Davis was a great officer and had been doing a great job.

### A. Davis's Retaliation Claims

Between August 2007 and his termination, Davis filed several grievances—both internally and with the Equal Employment Opportunity Commission ("EEOC").[4]  Gilmore and City Manager Wendell Johnson, the decision-makers in charge of Davis's termination, were aware that Davis had filed EEOC complaints.

### B. Chief Gilmore's Tenure and Davis's Termination

The City hired Gilmore as chief on September 28, 2009.  For years, the Department had been in turmoil and had lost its accreditation.  Gilmore's first order of business was to restore order in the Department and regain that

---

[3]    Gilmore, however, merely signed off on the evaluation, which her predecessor wrote.

[4]    The Department had several different police chiefs and interim chiefs during this time: David Allbritton (1996-2008), Steven Burch (March 2008-July 2008), Carlton Tunsil (July 2008-August 2008), Robert Charles (August 2008-February 2009), Gary Laxton (March 2009-June 2009), Carlton Tunsil (June 2009-September, 2009), and Argatha Gilmore (September 28, 2009 to present).

accreditation. To that end, Gilmore put in long hours, often working from 7 a.m. to 7 p.m. She began requiring Davis, her second-in-command, to meet with her twice a day, at the beginning of the work day and at 5:00 p.m. This increased oversight highlighted differences in Gilmore and Davis's approaches to running the Department. Gilmore stated that she wanted to meet with Davis twice a day in part because he was not around the office much, and she wanted to know how he, as her second-in-command, was filling his days. Davis found Gilmore's request that he stay past 5:00 every day to be unusual, and felt he was being singled out for some reason. Davis asked Gilmore why she was requiring him to stay past 5:00 every day for a routine update meeting that he felt could have been held during regular working hours. Gilmore described Davis's attitude towards these meetings as "annoyed," "resentful and not supportive," and noted that Davis "did not offer suggestions for progress for the [D]epartment based on what his day had brought."

On November 3, 2009—just over one month after Gilmore started as chief—Davis met with her in a "one-on-one meeting." Gilmore asked Davis what he thought his role as a captain was, and asked him to describe his daily activities. Davis described going out on calls with officers and staying in touch with them—tasks that Gilmore felt "were more closely aligned with the job duties of a [s]ergeant" or patrol officer, not a captain who was second-in-command. In contrast, Gilmore expected a captain to be "responsible for planning, forecasting,

4

delegating, directing operations, resource gathering, administering and oversight of policies and procedures. . . . The [c]aptain oversees operations from an objective viewpoint and is the visionary." Gilmore explained her expectations of a captain to Davis, while Davis took notes. Gilmore describes Davis's demeanor during the one-on-one meeting as "annoyed," "visibly angry," and "seething."

The same day, Gilmore contacted the city manager, Wendell Johnson, and recommended Davis's termination. On November 16, 2009, the City terminated Davis. The termination letter stated that Gilmore had made an assessment of the Department and the community, and determined that Davis's services were no longer needed. The letter contained no further detail as to the reasons for Davis's termination.

Davis claims that the City gave differing reasons for his termination to different people. For all official purposes, the City characterized Davis's termination as being driven by fundamental differences between Gilmore's vision for the future of the Department and Davis's understanding of his role as second-in-command. Davis, according to the City, "did not understand his role as [c]aptain and did not possess the skill set [Gilmore] was looking for as a [c]aptain. . . . Davis was functioning in the mentality of a [s]ergeant or officer." While Gilmore was putting in long hours, Davis was a clock-watcher, resentful of

Gilmore's oversight and unwilling to do what it would take to turn the Department around.

Davis, however, argues that record evidence contradicts the City's official characterization of his termination. This other evidence, he argues, suggests that the City considered Davis's termination to have been based on misconduct, rather than Davis's failure to buy into and comply with Gilmore's management philosophy. In support of this contention, Davis relies on three pieces of evidence: the testimony of a local pastor, John Edwards, the testimony of the president of the local chapter of the NAACP, John Mayo, and an EEOC Letter of Determination. Edwards recounted his conversations with Gilmore, several years earlier, in which she described her reasons for terminating Davis. Rather than reflecting an inconsistency, Edwards's reporting of Gilmore's reasons is consistent—she felt that she had to terminate Davis based on their differing ideas of Davis's job responsibilities. Edwards testified that Gilmore wanted Davis, as her second-in-command, to work with her in the office, whereas Davis wanted to work in the field. Moreover, while Gilmore had hoped to work with Davis, she found he was not on her "team."[5] Mayo also related a conversation he had with Gilmore several

---

[5]   The City's counsel asked Edwards, "Did [Gilmore] mention anything in the conversation about needing Captain Davis to be on her team?" Edwards answered, "Yeah she—she told me that she was really depending on him and that she thought that she was going to be able to work with him because they was [sic] both Afro Americans and that she was surprised that she wasn't able to." In an effort to recast Edwards's testimony to support Davis's theory that Gilmore sometimes said she terminated Davis for misconduct, Davis contends that Gilmore said he was

years earlier about the reason for Davis's termination.  Again, rather than suggest

inconsistency, Mayo's testimony reflects the City's consistent theme—that

Gilmore's evaluation of Davis was that he did not meet her expectations as the

second-in-command of her team charged with regaining accreditation of the

Department.[6]  Davis also relies upon the EEOC's Letter of Determination, which

reported that the City "admitted that [Davis] was terminated for being an

insubordinate subordinate."  When asked in her deposition whether Davis was

insubordinate during her tenure, Gilmore answered, "I guess that would be a matter

of interpretation."

Davis also contends that the City characterized his termination as an

"administrative termination not involving misconduct" to avoid having to afford

Davis certain procedural protections.  The City had a progressive discipline policy

under which the City was required to follow a series of increasingly serious

disciplinary actions against an officer guilty of misconduct.  For example, for

"loafing or inattention to duty," the City was to start with an oral reprimand, then a

terminated for "insubordination."  However, Edwards's actual testimony does not support
Davis's contention.

[6]     For example, Mayo recounted that when Gilmore explained what she wanted Davis to do
and discussed "some specific duties of a captain and she state [sic] that everything I was
presenting to Mr. Davis, he would say:  No, no, no. That's not part of my duties.  That's not the
scope of my duties. . . . She started talking about everything I asked him to do, he would always
state that's not part of my duties."  Gilmore was also concerned that she could not account for
Davis's whereabouts:  "And he, many times—I don't know where he is.  We're here; you know,
where is he. . . . He'd be unaccounted for and he'll come in and he'll say—and she'd say he'll
come in sometimes and be here, be in the office for about two hours and then he'd disappear."
Gilmore apparently also expressed that Davis "just don't [sic] seem to want to listen to me."

written reprimand, then demotion, then dismissal. Davis contends that had the City accused Davis of misconduct, the City would have been required to follow the progressive discipline policy rather than terminating him immediately.

Davis also argues, as evidence of pretext, that the City treated him unusually harshly compared to another similarly situated employee. Davis states that around the same time that he was fired, Joe Moody—a Caucasian lieutenant—was demoted rather than terminated. Moody's superiors had noted several performance problems. Moody claimed these performance issues were the result of health problems, and voluntarily requested a demotion, which the City granted.

### C. **The District Court's Opinion**

The district court granted summary judgment for the City.[7] Relevant here, the court concluded that while Davis succeeded in presenting a prima facie case of retaliation as to his termination, he failed to demonstrate that the City's legitimate, non-retaliatory reasons for Davis's termination were pretextual.

## II.   ANALYSIS

### A. **Standard of Review**

> We review an entry of summary judgment de novo,
> construing all facts and drawing all reasonable inferences
> in favor of the nonmoving party. We "may not weigh
> conflicting evidence or make credibility determinations

---

[7]   As indicated above, the sole issue here is pretext. But, because Davis alleged a labyrinth of discrimination and retaliation claims resulting in a wide variety of adverse employment actions taken by different administrations over a 13-year period of time, the district court's 54-page order is exhaustive.

of [our] own. If the record presents disputed issues of
fact, the court may not decide them; rather, [we] must
deny the motion and proceed to trial."

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291-92 (11th Cir. 2012) (alteration

in original).

## B. Retaliation

Title VII prohibits retaliation against an employee who has "opposed any

practice made an unlawful employment practice by [Title VII], or because he has

made a charge . . . or participated in any manner in any investigation, proceeding

or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  To make out a prima facie

case of retaliation, a plaintiff must show:  (1) that he engaged in an activity

protected under Title VII; (2) that he suffered a materially adverse action; and

(3) that there was a causal connection between the protected activity and the

adverse action.  *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013).

Once a plaintiff has established a prima facie case of retaliation, the burden shifts

to the defendant to articulate a legitimate, non-retaliatory reason for the challenged

employment action.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th

Cir. 2001).  The burden then shifts back to the plaintiff to establish that the

employer's proffered reason for the termination was pretext for retaliation.  *Id.*

The district court found, and the City concedes, that Davis established a

prima facie case of retaliation for his termination.  The City also supplied a

legitimate, non-retaliatory reason for Davis's termination:  that Davis did not fit into Chief Gilmore's command structure and vision for the future of the Department.  Therefore, as the parties agree, the only issue for us to determine is whether the City's proffered reason was pretext for retaliation.

To show pretext, Davis must demonstrate that the City's "proffered reason was not the true reason for the employment decision." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  A plaintiff withstands summary judgment if, in view of all the evidence, the district court determines that the "plaintiff has cast sufficient doubt on the defendant's proffered . . . reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  As indicated above, Davis asserts several points that, he argues, suggest the City's "legitimate reason" for his termination was pretextual.  Those points are examined in turn.

### i.    Lieutenant Moody's Demotion

First, Davis refers to Lieutenant Moody as his comparator, arguing that Moody was given the option of taking a demotion, while Davis was not.  Moody is not an appropriate comparator with regard to Davis's termination because Moody, whose performance problems were health-related, voluntarily requested demotion.

Therefore, the circumstances leading to the City's employment actions against Moody and Davis were too different for Moody to be an appropriate comparator.

### ii.    Shifting Reasons for Termination

Next, Davis argues that the City gave shifting reasons for his termination. As the district court correctly noted, "an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." Decision on Summ. J. at 39 (citing *Hulbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)). However, an employer's further elaboration of a general reason is not evidence of pretext. *Id.* at 40 (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998)).

Gilmore testified that Davis was not terminated because of any misconduct or disciplinary issue. Davis argues that the evidence suggests that the City considered him to be guilty of misconduct, rather than, as the City proffers, failing to fit into Gilmore's vision of the Department, and what is required of her second-in-command. Davis points to the impressions of two members of the community after speaking to Gilmore about Davis's termination, a statement by an unnamed City representative reflected in an EEOC Determination Letter that Davis was an "insubordinate subordinate," and Gilmore's testimony that whether Davis was insubordinate was a "matter of interpretation."

11

However, Davis's attempt to establish that the City has offered inconsistent reasons for his termination falls short.  Rather, the evidence shows that the City's description of Davis's shortcomings forming the basis for his termination are all variations on the same non-retaliatory theme—that Davis refused to fit into and adhere to the management vision of the new sheriff in town.  Community members' statements recounting Gilmore's reasons for Davis's termination are not inconsistent with Gilmore's own statements about Davis—that he was resentful of her, and that he "did not possess the skill set necessary for a captain and did not fit into her command structure."  In fact, they are wholly consistent, and are merely "further elaboration of a general reason" for Davis's termination.

Similarly, the EEOC Determination Letter does not evidence shifting reasons for termination.  That letter states that an unnamed City representative said that Davis was fired for being an "insubordinate subordinate," but does not describe the conduct on which that representative based his or her statement. There is no indication of what was meant by the rather vague term "insubordinate subordinate."  Webster's Dictionary, for example, defines "insubordinate" as "not obeying authority; refusing to follow orders."  "Insubordinate," Merriam-Webster Online Dictionary, 2014, http://www.merriam-webster.com (Jan. 13, 2014).  As synonyms, Webster's offers "balky," "contrary," and "defiant." *Id.*  Gilmore's suggestion that whether Davis was insubordinate was "a matter of interpretation"

12

highlights the variable uses of the word "insubordinate."[8]  Certainly, Gilmore's sense that Davis was resentful of her and resistant to following her lead could be interpreted by some as being "insubordinate," even though Davis may not have committed any wrongdoing rising to the level of affirmative misconduct.  Nor, as the district court noted, does the EEOC letter make clear whether the City's representative even used the term "insubordination" or whether the EEOC investigator drew that conclusion based on the conduct that the City's representative described.  Moreover, the letter clearly states that the City's position was that Davis's termination was not based on "any misconduct or performance issue."  Without more context, the statement in the EEOC Determination Letter, on its face, does not evidence any deviation from the City's stated reason for Davis's termination.

Therefore, we find Davis's attempt to create an issue of fact as to shifting reasons for his termination unconvincing.  The record evidence, even when viewed in the light most favorable to Davis, shows the City consistently voicing the same non-retaliatory reason for Davis's termination.

---

[8]     As we recently observed, "'Definitions belong to the definers, not the defined.'" *United States v. Contreras*, 11th Cir. 2014, __ F.3d __ (No. 13-10928, Jan. 2, 2014), quoting Toni Morrison, *Beloved* 190 (1987).  It seems apparent that Gilmore's interpretation of "insubordination," as applied to Davis, would include his resistance to Gilmore's management philosophy.

iii.    Deliberate Avoidance of Progressive Discipline Policy

Davis also argues that the City's failure to make a finding of misconduct may have been orchestrated to avoid the City's progressive discipline policy. To begin with, this argument is purely speculative. Moreover, the record does not contain a factual issue as to whether Davis committed misconduct that would invoke that policy. As discussed above, the City has consistently stated that Davis did not meet Gilmore's requirements for a supportive second-in-command. Therefore, his termination would not, under any reasonable interpretation of the facts, have triggered the City's obligation to follow its progressive discipline policy.

iv.    Gilmore's Immediate Decision to Terminate Davis

Davis argues that Gilmore's immediate decision to recommend his termination after their "one-on-one" meeting is suspicious in light of Davis's statements that he "took copious notes when meeting with [Gilmore] to discuss his job duties," and did not refuse to follow any of her directives. However, Gilmore had several weeks of working closely with Davis before the November 3, 2009 one-on-one meeting to determine whether he was suited to be her second-in-command. Over that time, Gilmore observed Davis to be resentful of her, difficult to work with, and unwilling to buy into her management philosophy. Therefore,

14

the immediacy of Gilmore's decision to terminate Davis following the one-on-one meeting does not demonstrate pretext.

### v.    City's Failure to Follow its Own Policy

Finally, Davis argues, without any citation to the record, that the City's policy stated that "an employee could only be recommended for termination for poor job performance or misconduct." That the City terminated him without citing poor job performance or misconduct, Davis argues, is evidence of pretext. However, because Davis points to no record evidence, nor could we find any support in the record for Davis's assertion that the City's policy required misconduct or poor job performance for termination, we will not consider this argument as a basis for pretext.

## III.    CONCLUSION

Davis made out a prima facie case of retaliation, but did not proffer sufficient evidence for a reasonable jury to find that the City's proffered legitimate, non-retaliatory reason for Davis's termination was pretextual.

**AFFIRMED.**

15